[Nos. 33425-5-I; 33590-1-I. Division One. February 20, 1996.]
MEYERS WAY DEVELOPMENT LIMITED PARTNERSHIP, ET
AL., *Appellants*, v. UNIVERSITY SAVINGS BANK,
*Respondent*.

656

*C. Nelson Berry; Richard J. Moore*; and *Joseph R. Jackson* and *Jardine Law Office*, for appellants.

*Michael E. Kipling* and *Graham & Dunn*, for respondent.

KENNEDY, A.C.J. — Meyers Way Development Limited Partnership, Meyers-Contek Limited Partnership, various of the limited and general partners of these two entities (hereinafter referred to collectively as Meyers Way) and Gary N. Jardine appeal a summary judgment dismissing their action for wrongful foreclosure against University Savings Bank (the Bank). The Bank foreclosed nonjudicially on a deed of trust securing a promissory note signed by appellants Jardine and Rupeiks and others who were parties below but who are not parties to this appeal (hereinafter referred to collectively as the borrowers or the grantors). Both Meyers Way and Jardine raise a number of challenges to the procedural and substantive validity of

the foreclosure under the Deed of Trust Act, RCW 61.24. They also argue that the successor trustee violated his fiduciary duty to the grantors in several ways, most notably by entering into an undisclosed agreement with the Bank whereby the Bank agreed to indemnify the trustee from any claims arising out of his service as trustee, including any claim of breach of fiduciary duty to the grantors.

In addition, Meyers Way appeals the judgment entered after a jury verdict in favor of the Bank on a conversion claim.[1] Meyers Way argues that the trial court improperly submitted the conversion claim to the jury because the Bank recovered the full value of the borrowers' indebtedness at the foreclosure sale, the Bank waived or is estopped to assert its claim, and the Bank could not maintain an action for conversion because it owned no right to immediate possession of the property allegedly converted.

We find no procedural or substantive violation of the deed of trust act, no breach of fiduciary duty by the trustee, and no error in submitting the conversion claim to the jury Accordingly, we affirm the summary judgment dismissing the wrongful foreclosure claim and the judgment entered on the verdict following the conversion trial.

## FACTS

In 1984, William Appel, Gary Jardine and Valentins Rupeiks (the original borrowers) purchased a 52-acre tract of land known as the Central Heights Property. The Bank financed the entire price of the acquisition with a $2.65 million loan. In June 1985, the loan was refinanced with a $4.07 million loan, in order to develop the property.

Between June 1985 and May 1987, the borrowers had difficulty moving the project forward. They attempted to sell the property but could not. Despite these difficulties, the Bank refinanced the loan for $6.25 million in May 1987.

---

[1]Jardine was not a party at the conversion trial.

The borrowers' difficulties continued into 1988. In March 1988, the Bank reminded the borrowers that the loan matured July 1, and informed them that the Bank was of the opinion that the borrowers lacked the sophistication to develop the project. The Bank suggested the need for a project manager with significant development experience and recommended the participation of John Sato and Vic Loehrer. The Bank conditioned any future refinance on Sato and Loehrer's participation in the project. Sato and Loehrer agreed to participate in the refinance and to manage the project. The fourth loan, which now included Sato and Loehrer as borrowers and cotenants of the Central Heights Property, was closed on September 26, 1988. At Jardine's request, Dale Foreman, then a law partner of Jardine, also became a borrower and cotenant of the property. This new loan was for $8.65 million. The term of the loan was 24 months, to September 26, 1990.

By the terms of the loan documents, the new loan moneys were to be disbursed as follows: pay off previous loan ($6.34 million); provide funds for installation of infrastructure ($1.48 million); provide interest carry ($650,000); pay some of loan costs ($180,000). In addition to a deed of trust giving the Bank first position, the borrowers executed security documents giving the Bank a lien on the proceeds of sale of sand from the property, calculated as follows: the borrowers could keep up to 30% of the gross sale proceeds for removal costs; the remaining 70% of the gross proceeds would be paid into the Bank, with 50% of the 70% to be applied to accrued interest on the loan and the remainder to be put into savings to build a reserve for taxes and similar expenses.

Interest on the loan, some $73,000 per month, would be paid monthly, from the interest carry and sand sale proceeds.

Improvements were to be constructed under contracts preapproved by the lender. The borrowers were to submit a schedule of estimated dates and amounts for disbursements to be paid as construction advanced. By the terms

of the agreement, construction was to be completed within 15 months from closing of the loan. Construction defaults included work stoppages for more than 30 consecutive days and "[i]f Borrower otherwise should lack the ability or right to complete improvements." Clerk's Papers at 825. Other events of default included failure to make any payment of interest or principal when due; default in the performance of any other covenant or term of the contract; litigation among the coborrowers; the filing by or against the borrowers of any petition in bankruptcy court. In the event of any default, the lender was entitled to withhold further disbursements.

By the terms of the promissory note, upon default, the lender was entitled, at its option, to accelerate the whole indebtedness and declare it immediately due and payable, provided that the borrower would first be given 30 days to cure any nonmonetary default and 10 days to cure any monetary default. After acceleration, a higher rate of interest, not lower than 21% per annum, would be charged, instead of the lower, "ordinary" contract interest rate.

In December 1988, Sato and Loehrer withdrew from the project and repudiated the loan agreement. Sato cited as reasons lack of sufficient equity to support the loan and poor economic viability of the project. Foreman also repudiated the loan agreement, reserving the right to sue the Bank if not released from the agreement.[2]

On January 6, 1989, the Bank, by letter, provided the borrowers 30 days' written notice of defaults under the loan agreement. The Bank cited as defaults: (1) the repudiation by Sato, Loehrer and Foreman; (2) lack of construction progress; (3) disputes among the borrowers preventing project development; (4) failure to remit proceeds from sales of sand; (5) potential loss of permits and approvals due to poor management; and (6) breach of a covenant in the loan agreement regarding litigation be-

---

[2]The Bank eventually released Sato, Loehrer and Foreman from liability on the loan.

tween coborrowers. On March 3, 1989, the Bank sent a letter to the borrowers, notifying them that it had elected to accelerate the loan, making the full debt immediately due and owing.

The Bank initiated nonjudicial foreclosure by sending notice to borrowers in an amended notice of default on July 19, 1989. A notice of trustee's sale was recorded on August 22, 1989, and the sale noted for December 1, 1989. The notice of default included the same defaults listed in the January 6 letter, and listed acts the borrowers could accomplish to cure the defaults. The notice told the borrowers they could also cure the defaults by paying the accelerated loan balance, at the ordinary contract interest rate. It will be observed that, to this point, all the defaults listed were nonmonetary defaults.

The borrowers sought the help of developer Michael Neeser in September 1989. He recognized that the project needed a strong manager when he arrived. Neeser reorganized the borrowers' interests, i.e., all of the nonrepudiating borrowers except Jardine transferred their interests to either of two limited partnerships formed for that purpose. Neeser did not contribute any capital, and told the Bank he would not do so. He attempted to negotiate an agreement with the Bank to forestall the foreclosure, claiming to have an interested investor. The Bank offered to postpone the trustee's sale if accrued contract interest, by then in arrears, was paid.

Neeser wrote the Bank on January 9, 1990, that Weyerhaeuser had an interest in the project. The Bank agreed to postpone the sale to January 12. The Bank offered to postpone the sale until March 1990 if it received written confirmation of Weyerhaeuser's interest, interest payments due and a release of all claims from the borrowers.

On January 12, 1990, Roger Jones of Ordal & Jones, was named as trustee.[3] Jones requested that the Bank

[3]Jones became the fourth trustee, and the third to undertake this foreclosure. The first successor trustee withdrew upon demand by one of the borrowers.

indemnify him from any suits regarding his services, including any claims of a breach of fiduciary duties. The Bank agreed, signing an indemnity agreement that same day.[4] The existence of the indemnity agreement was not disclosed to the grantors. The Bank informed the borrowers that the sale was postponed to January 26 to allow Weyerhaeuser to provide written confirmation, as requested.

On January 19, Jones (the trustee) wrote the Bank's attorney and informed him that the notice of foreclosure and trustee's sale documents were fatally defective, as they implied that full payment of the note was necessary to reinstate the loan. He recommended discontinuing the sale and proceeding anew. He also agreed to continue as trustee on the understanding that the circumstances of his letter were covered by the indemnity agreement. Jones altered this opinion considerably in a letter dated January 22, 1990, after discussing the matter with the Bank's attorney and realizing that the initial default notices listed only nonmonetary defaults.[5] The borrowers were not made aware of Jones's initial or altered opinions.

In the meantime, the Bank had offered to continue the sale to a date in March 1990, if the borrowers could provide written confirmation from Weyerhaeuser of its interest in the project, would pay accrued interest by then

---

The second successor trustee withdrew because his law firm represented Weyerhaeuser, who was at the time expressing interest in the property.

[4]The agreement states: "The undersigned Beneficiary agrees to indemnify, defend and hold Indemnitee harmless from any and all claims (including but not limited to lawsuits) against him which arise out of or relate to his serving as trustee. Without limiting the foregoing, this indemnity agreement specifically includes a claim that Indemnitee has breached any asserted fiduciary duty to the debtors." Clerk's Papers at 5303.

[5]Jones wrote: "[I]t is the case that my previously expressed views are altered by the fact that there were no monetary defaults under the loan at the time of the July and August 1989 foreclosure notices issued.

"Not to split hairs, however, I believe the issue still remains if, and only if, the trustee would assert the grantors' obligation to pay the indicated foreclosure expenses on an attempt to reinstate the loan. . . .

"Subject to these observations, I withdraw - or at least temper - my previous conclusion that the notices are arguably defective." Clerk's Papers at 3320.

in arrears, and would sign a release of all claims, Neeser having in the interim informed the Bank he believed the borrowers had a viable lender-liability claim. Weyerhaeuser confirmed its interest in a letter dated January 23, and the borrowers executed and delivered the requested releases. But the borrowers did not pay the accrued interest. The Bank rescheduled the sale for February 16, 1990.

On February 16, 1990, Weyerhaeuser withdrew its interest in the project, citing as reasons the lack of adequate development expertise and financial strength on the part of Meyers Way. That same day, the day of the latest scheduled trustee's sale, Meyers Way filed a Chapter 11 bankruptcy petition in Seattle, which automatically stayed the sale. On June 11, the bankruptcy judge dismissed the bankruptcy petition, finding that it was filed in a bad faith effort by Meyers Way to delay the trustee's sale.

On June 19 and 27, 1990, the Bank reissued notices of the trustee's sale and foreclosure, on shortened 45-day notice. These notices included a default by the failure to pay default interest since March 3, 1989, the date the Bank accelerated the note.

One month later, Neeser wrote Jones informing him that the Bank's claimed defaults were erroneous and had all been cured in any event. By letter of August 8, 1990, Jones declined to investigate the alleged cure if Meyers Way did not cure the significant monetary defaults which now existed.[6]

On August 9, 1990, Meyers Way filed the current suit. Meyers Way also sought to restrain the sale because the June 1990 notices included a belated claim for default interest. In response, the Bank agreed to exclude default interest from its bid if the trustee's sale took place on

---

[6]Jones wrote: "[T]he continuing existence of asserted, substantial monetary defaults, together with the failure of tender (or protest to) foreclosure expenses, made resolution of the continuing existence of non-monetary defaults seem academic." Clerk's Papers at 5931. Jones requested payment of approximately $140,000 in foreclosure expenses, $600,000 in contract interest, and possibly default interest (Jones did not then know what position the Bank took with regard to default interest).

August 17. The Bank also counterclaimed and brought a third party claim against Neeser and Meyers Way for conversion of the proceeds from sales of sand excavated from the property. Shortly thereafter, Meyers Way filed a second bankruptcy petition, in Nevada.

On August 23, Meyers Way submitted an invoice of $695,000 to the Bank for infrastructure provided to the property. On August 24, the date the sale was rescheduled as a result of the Chapter 11 filing, the bankruptcy judge in Nevada deemed the petition to have been brought in bad faith. Instead of dismissing the petition, the court retained jurisdiction, lifted the automatic stay and ordered the sale to proceed that afternoon.[7] It will be observed that the trustee's sale took place a month before the loan was due to mature.

After the sale, the Bank moved for summary judgment of dismissal of all claims. Meyers Way cross-moved for dismissal of the conversion claim. In two separate orders, the trial court granted the Bank's motion for summary judgment. The first order dismissed all of Meyers Way's claims except improper acceleration of the note and claims based on its assignments of interests received from the borrowers. In the second order, the trial court found that the plaintiffs were in default of the loan at all material times, that the notices of the 1989 trustee's sale were valid, that the 1990 notices were valid, that the trustee did not violate his fiduciary duty, that the inclusion of default interest in the notice of sale was not cause for setting aside the sale, and that equitable principles did not support setting aside the sale.

The case proceeded to trial on the Bank's conversion claim. The jury found that Meyers Way had converted sand sale proceeds and assessed damages at $179,932. The jury declared itself unable to decide whether Neeser had

---

[7]The Bank was the only bidder at the sale. It purchased the property for $7.8 million, an amount equal to the borrowers' indebtedness, not including the default interest. The Bank sold the property to Nintendo the following month for $7.85 million.

committed conversion. The trial judge entered a judgment notwithstanding the jury's inability to reach a verdict, ruling that Neeser was liable for conversion as a matter of law.

This timely appeal followed.

## DISCUSSION

### I

#### Wrongful Foreclosure

■ When reviewing an order on summary judgment this court engages in the same inquiry as the trial court. *Simpson Tacoma Kraft Co. v. Department of Ecology*, 119 Wn.2d 640, 646, 835 P.2d 1030 (1992). A court should grant summary judgment only where no genuine issue of material fact exists, and the moving party is entitled to judgment as a matter of law. *Simpson Tacoma Kraft*, 119 Wn.2d at 646. We consider the facts in a light most favorable to the nonmoving party. *Simpson Tacoma Kraft*, 119 Wn.2d at 646.

#### A. Trustee Breach of Fiduciary Duty

Meyers Way and Jardine argue that the trial court erred in dismissing on summary judgment their claim that the trustee breached his fiduciary duty. The parties do not dispute the underlying facts, but rather dispute whether the facts entitled the Bank to judgment as a matter of law. Meyers Way and Jardine argue that the indemnity agreement was a breach of Jones's fiduciary duty, per se, as a matter of law, because the effect was to allow Jones to violate the grantors' rights with impunity, knowing he would be indemnified by the Bank.

■ ■ A trustee of a deed of trust acts as the fiduciary for both the creditor and debtor on a deed of trust, so must act impartially between them. *Cox v. Helenius*, 103 Wn.2d 383, 389, 693 P.2d 683 (1985). Because a deed of trust foreclosure is a nonjudicial proceeding, the trustee's

fiduciary duty to the debtor is "exceedingly high." *Cox*, 103 Wn.2d at 388-89. Despite this high duty, the *Cox* court recognized that a trustee need not guarantee that the debtor is protecting his or her own interests. *Cox*, 103 Wn.2d at 389; *see also Cascade Manor Assocs. v. Witherspoon, Kelley, Davenport & Toole, P.S.*, 69 Wn. App. 923, 935, 850 P.2d 1380 (1993), *review denied*, 123 Wn.2d 1003 (1994) (citing *Cox*, 103 Wn.2d at 389). Neither does the high fiduciary duty prevent a trustee from serving simultaneously as the creditor's attorney, agent, employee or subsidiary. *See* RCW 61.24.020[8] ; *Cox*, 103 Wn.2d at 390; *Cascade*, 69 Wn. App. at 935. The trustee serving in such a dual role must transfer one role to another party if serving in this capacity causes an actual conflict of interest with the debtor. *Cox*, 103 Wn.2d at 390.

In the instant case, Meyers Way and Jardine assert four breaches of fiduciary duty: (1) the indemnity agreement itself; (2) Jones's failure to tell the borrowers what he told the bank—that the notice of default was fatally defective; (3) Jones's failure to exercise independent judgment in setting the sale to occur 45 days after dismissal of the first bad faith bankruptcy; and (4) Jones's failure to investigate Meyers Way's claim of cure.

■ We first address the indemnity agreement between Jones and the Bank. We agree with the trial court that the indemnity agreement was not per se a breach of fiduciary duty and adopt the trial court's ruling that, by its nature, an indemnity agreement between a deed of trust beneficiary and the trustee foreclosing on the deed of trust requires heightened judicial scrutiny of any claims of breach of fiduciary duty, given the "exceedingly high" fiduciary duty owed by a trustee to the debtor. *See Cox*, 103 Wn.2d at 388-89.

Even if by the indemnity agreement Jones became the equivalent of the Bank's attorney, agent or employee, as

---

[8]In 1975, the Legislature deleted that portion of 61.24.020 which read, "nor may the trustee be an employee, agent, or subsidiary of a beneficiary of the same deed of trust." Laws 1975, 1st Ex. Sess., ch. 129, § 2.

claimed by the appellants, *Cox* does not prevent Jones from serving in both of these roles. Only an actual conflict of interest can precipitate a breach of fiduciary duty. *Cox*, 103 Wn.2d at 390. The indemnity agreement does not include any provisions requiring Jones to adopt the Bank's position without regard to the rights of the borrowers. If the agreement in question had contained such provisions, we would, of course, agree with the appellants' position. But this agreement merely required the Bank to indemnify the trustee from any claims arising from his services, including any claims asserted by the grantors that the trustee had breached his fiduciary duty to them.

Whether or not the record supports the Bank's claim that this agreement was justified by the litigious nature of the grantors, the very nature of a trustee's role leaves the trustee vulnerable to claims arising from the foreclosure process. A completed foreclosure is bound to result in an unhappy grantor, and often a grantor who may perceive, as in this case, breaches of fiduciary duty which ultimately prove not to have been breaches. Still, litigation is expensive, time-consuming, and emotionally draining. We believe that to prohibit indemnity agreements such as the one in this case would make it difficult to find qualified people willing to serve as trustees, frustrating one of the purposes of the deed of trust act—keeping the nonjudicial foreclosure process efficient and inexpensive. *Cox*, 103 Wn.2d at 387. The heightened judicial scrutiny standard will deter the abuse of the protections offered to trustees by such agreements, when their existence becomes known, either by voluntary disclosure or, as apparently was the case here, through the discovery process when litigation ensues.

Second, Jones did not breach his duty by failing to disclose his initial belief that the notices filed by the earlier trustee were fatally defective. Jones's belief derived from his misunderstanding of the nature of the initial defaults. The notices named only nonmonetary defaults and set forth the requisite nonmonetary cures. The notices stated

that cure could also be made by paying the note in full (a rather obvious means of curing *any* default). Jones initially feared that this alternative recital of cure made the notices defective, a position he withdrew after realizing that the Bank claimed no monetary defaults on the loan, at the time of the notices.[9]

■ A trustee's fiduciary duty does not require that he or she report erroneous conclusions to both parties or, having reported to one party and learning of the error, report the initial mistake to the other party. As a matter of law, Jones was not required to make sure that the borrowers were vigilantly guarding their rights. *Cox*, 103 Wn.2d at 386. By informing the Bank of his initial opinion and recommending a postponement, Jones acted in a manner consistent with his duty to the borrowers. We disagree with the appellants that *Cox* dictates a different result. There, in dicta, the Supreme Court opined that the trustee should have notified the grantor's attorney that, in the trustee's (legally correct) opinion, the filing of a lawsuit requesting that a sale be restrained does not in and of itself restrain the sale—the grantor must request the court to issue a restraining order and the order must be issued, before the sale is restrained. *Cox*, 103 Wn.2d at 388, 390. This is a far cry from suggesting that the trustee must report legally incorrect opinions initially held and promptly withdrawn.

Third, there is no evidence that Jones, by setting a new sale date 45 days after the dismissal of the borrowers' first bankruptcy action, failed to exercise independent judgment. Moreover, this act was in compliance with RCW 61.24.130(4) (relating specifically to sale dates after bankruptcy actions are dismissed). In the words of the trial court, "The shortened notice following a finding of bad faith bankruptcy cannot seriously be criticized." Clerk's Papers at 3711.

---

[9]Despite Meyers Way's assertion to the contrary, the phrase "the default can also be cured by paying off the note" does not communicate a demand for full payment of the note as prerequisite to curing the nonmonetary defaults.

Finally, the trustee properly declined to investigate Meyers Way's claim to have cured the nonmonetary defaults. By the time Meyers Way made the claim, significant monetary default existed. It would be fruitless to require trustees to investigate claims of cured nonmonetary defaults where the result would be moot, given the existence of monetary default.

■ In sum, on these undisputed facts, applying heightened judicial scrutiny, we conclude as a matter of law that the trustee committed no breach of fiduciary duty.

## B. Violation of Deed of Trust Act, RCW 61.24

### 1. Procedural Defects

#### a. *Acceleration*

Meyers Way and Jardine argue that RCW 61.24.090(1)(a) prevents a creditor foreclosing nonjudicially under the Deed of Trust Act from accelerating a defaulted loan.

RCW 61.24.090 provides, in relevant part:

> (1) At any time prior to the eleventh day before the date set by the trustee for the sale in the recorded notice of sale . . . the grantor. . . shall be entitled to cause a discontinuance of the sale proceedings by curing the default or defaults set forth in the notice, which in case of a default by failure to pay, shall be by paying to the trustee:

> (a) The entire amount then due under the terms of the deed of trust. . ., other than such portion of the principal as would not then be due had no default occurred . . . .

■■ This court must enforce the plain meaning of a statute. *Kleyer v. Harborview Medical Ctr.*, 76 Wn. App. 542, 547-48, 887 P.2d 468 (1995). Nothing in this provision prohibits the acceleration of a loan in order to charge default interest on the amount owing. RCW 61.24.090(1)(a) simply precludes the creditor from enforcing the election prior to the eleventh day before the date of the trustee's sale, and allows the debtor to reinstate the loan prior to that time by paying the amount which would have been

due under the terms of the deed of trust if no default had occurred.

RCW 61.24 establishes a streamlined, statutory method for foreclosing on deeds of trust. *See Koegel v. Prudential Mut. Sav. Bank*, 51 Wn. App. 108, 113, 752 P.2d 385, *review denied*, 111 Wn.2d 1004 (1988). A statute with this limited purpose should not be interpreted as imposing substantive limitations on the form and substance of agreements between contracting parties. In this instance, it should not be interpreted as precluding an acceleration clause in a loan agreement, or making such a clause a nullity in a deed of trust foreclosure. One of the primary reasons that parties use a deed of trust is the availability of this foreclosure method which is less expensive for everyone involved. *See Koegel*, 51 Wn. App. at 113 (" 'the nonjudicial foreclosure process should remain efficient and inexpensive' ") (quoting *Cox*, 103 Wn.2d at 387).

The Bank's acceleration of the loan and inclusion of default interest were permissible under RCW 61.24.090.

b. *Default Interest*

Meyers Way and Jardine make three arguments relating to the imposition of default interest: (1) the Bank waived this claim by not asserting it in timely fashion; (2) the inclusion of default interest required 90 days' notice before the sale pursuant to RCW 61.24.040; and (3) the inclusion of default interest for the first time after the first bankruptcy proceeding required reinitiating the foreclosure process.

■ Meyers Way's waiver argument is not supported by the unambiguous language of the promissory note and deed of trust. Both the note and deed of trust include a provision allowing for interest at the default rate after accelerating the loan, and the Bank's failure at any time to assert a claim for default interest would not defeat that claim or serve as a waiver. Even if this language is ambiguous, the Bank did not knowingly waive its claim for default interest. Waiver is the express relinquishment of a known right. *See Wagner v. Wagner*, 95 Wn.2d 94,

102, 621 P.2d 1279 (1980). The Bank did not waive its known right. It asserted it, by electing to accelerate the note in accord with the terms of the contract. Summary judgment on this issue was proper.[10]

The other two arguments concerning default interest allege a procedural error resulting from the addition of default interest to the notice issued after the dismissal of the bankruptcy petition, the sale to occur in 45 days.

■■ Meyers Way's 90-day notice argument contradicts the plain language of RCW 61.24.130(4):

> If a trustee's sale has been stayed as a result of the filing of a petition in federal bankruptcy court and . . . an order is entered . . . dismissing the case . . . the trustee may set a new sale date which shall not be less than forty-five days after the date of the bankruptcy court's order. The trustee shall:
>
> (a) Comply with the requirements of RCW 61.24.040(1)(a) through (f) at least thirty days before the new sale date . . .

RCW 61.24.040(1)(a) through (f) details all of the procedural steps to initiate a foreclosure and trustee's sale. Although RCW 61.24.130 incorporates the notice forms and procedures of RCW 61.24.040, it also *explicitly* allows the sale to occur on a more expedited schedule. Harmonizing the statutes, RCW 61.24.130(4) adopts the forms and procedures of RCW 61.24.040, but applies a different time frame for notice. Thus, the trustee was not required to allow 90 days to pass before the sale could occur.

Finally, the addition of default interest into the requirements for financial cure was not cause for renewing the process from the beginning. The statute does not explicitly include or exclude a requirement that the notices of default and sale issued after the bankruptcy mirror those before the bankruptcy. However, by requiring all new no-

---

[10]Meyers Way also notes that the Bank agreed not to bid for default judgment in response to Meyers Way's motion for summary judgment. The Bank only agreed to not bid default interest if the sale occurred on the scheduled date of August 17, 1990. The sale did not take place until August 24. Moreover, the Bank specifically preserved its right to claim interest at the default rate.

tices in compliance with RCW 61.24.040(1)(a) through (f), the statute contemplates that some new developments (cures or defaults) may have arisen during the pendency of the bankruptcy. The provision for a shortened time span for issuing these notices and holding the sale balances the debtor's need for notice and a chance to cure with the creditor's continuing losses resulting from the delay in the foreclosure process. The debtor receives new notices; the creditor receives a shorter time frame for foreclosing on the property. Thus, the trustee did not violate RCW 61.24.130(4) or .040(1) by not reinitiating the foreclosure.

2. Substantive Defects

Meyers Way and Jardine argue that they never were in breach of the loan agreement and deed of trust.

The existence of a default is a prerequisite to starting a nonjudicial foreclosure proceeding. RCW 61.24.030(3); *Cox*, 103 Wn.2d at 387.

We need not examine all the listed nonmonetary defaults that caused the Bank to initiate foreclosure proceedings, because there is no genuine issue of material fact as to the borrowers' inability to construct the anticipated improvements within the construction deadline provided in the loan agreement.[11] The improvements were to be completed by December 1989. All of the parties understood that Sato and Loehrer were brought into the project in order to accomplish what the borrowers knew they had yet to accomplish since initially purchasing the property four years earlier—completion of the improvements by the loan deadline.[12] When Sato and Loehrer left within a short time after closing the new loan, the borrowers lost their ability to make significant construction

---

[11]Meyers Way argues that the Bank caused the default by failing to tender improvement money after December 1988. The Bank had the contractual right to refuse to advance construction monies after the borrowers defaulted.

[12]Meyers Way claims to have made significant "safety" improvements in the property. These safety improvements were simply the removal of sand, which unsafe condition was caused by excavation of the sand itself.

progress.[13] The problem was not cured by Neeser's participation. The borrowers were given the 30-day notice required by the loan agreement in January 1990, and had not cured the default by July 1990 when the Bank commenced foreclosure proceedings. Although the borrowers claim they made significant progress, they do so in a conclusory manner, without setting forth evidentiary facts from which a trier of fact could find the claim to be true and without comparing the progress of the improvements with the time lines required by the contract. Although the borrowers claim to have made significant progress by the time of the trustee's sale in August 1990, this occurred one month prior to the date the loan matured, and there is no showing that the improvements, which were to have been completed, by the terms of the contract, nearly a year earlier, were anywhere near completion. This was not a sufficient showing to withstand summary judgment.[14]

Moreover, Meyers Way's claims to have cured the nonmonetary defaults before the trustee's sale are academic, because significant monetary defaults by then existed. The trial court appropriately declined to set aside the sale.[15]

## II

### CONVERSION ACTION

The Central Heights property included a large deposit

---

[13]Meyers Way argues that substantial improvements were made up to the time of the trustee's sale. This sale occurred months beyond the scheduled time for completion of the improvements. In any event, the improvements were not complete even at this late date.

[14]Because we affirm the trial court's finding on summary judgment that Meyers Way was in default of the construction progress requirements under the loan agreement, we need not address Bank's claim that Meyers Way should be collaterally estopped by the prior bankruptcy proceedings from claiming a lack of default.

[15]Because we conclude that the deed of trust foreclosure was procedurally and substantively valid, we need not address the validity and effect of either the releases given to the Bank by the borrowers or the settlement agreements entered into during and after the proceedings below. We summarily reject the Bank's contention that Jardine and Rupeiks have no standing to appeal the summary judgment rulings.

of sand which needed to be excavated in order to develop the property. As part of the 1988 loan, and by way of security agreements and the deed of trust, the Bank owned a security interest in the sand and the proceeds from the sale of sand.

Throughout these proceedings, including the period of the two bankruptcy filings, Meyers Way sold sand from the property without remitting the proceeds to the Bank as required by the loan agreement. In February 1990, Neeser informed the Bank that the sand was in a dangerous position, the excavation having left a large cliff of sand, and that he had contracted to have the sand made safe. The proceeds from the sale of this sand would pay the excavators. On February 26, the Bank consented to this arrangement. In April 1990, the Bank suspected, as a result of a letter from Neeser, that the sand excavation was exceeding that necessary to make the property safe, and wrote Meyers Way a letter demanding that any proceeds beyond what was used to remedy the problem be turned over to the Bank as cash collateral. Meyers Way sold hundreds of thousands of dollars worth of sand in 1990, from which the Bank claimed to have received nothing. The Bank's conversion claim proceeded to trial, after the trustee's sale had already occurred. The sufficiency of the evidence to prove that Meyers Way received sand sale proceeds that should have been paid to the Bank is not before us.

Rather, Meyers Way argues that the trial court improperly submitted to the jury the issue of whether Neeser and Meyers Way converted the proceeds of sand sales because: the Bank had no immediate right to possession of the sand proceeds, the foreclosure sale satisfied the Bank's debt and precluded a finding of damages from converted sand, and the Bank either waived or should be estopped from claiming default interest under the guise of a tort judgment.

 █ Conversion is the unjustified, willful interference with a chattel which deprives a person entitled to

the property of possession. *See Eggert v. Vincent*, 44 Wn. App. 851, 854, 723 P.2d 527 (1986), *review denied*, 107 Wn.2d 1034 (1987). The burden is on the plaintiff to establish ownership and a right to possession of the converted property. *Eggert*, 44 Wn. App. at 854-55. The *Eggert* court specifically noted that Washington adheres to the rule that the plaintiff must be in possession or have the immediate right to possession of the property. *Eggert*, 44 Wn. App. at 855. However, the more modern view, which we adopt, holds that to maintain a conversion action, the plaintiff need only establish "some property interest in the goods allegedly converted." *See Michel v. Melgren*, 70 Wn. App. 373, 376, 853 P.2d 940 (1993) (citing *Sussman v. Mentzer*, 193 Wash. 517, 520, 76 P.2d 595 (1938); *Pacific Gamble Robinson Co. v. Chef-Reddy Foods Corp.*, 42 Wn. App. 195, 202, 710 P.2d 804 (1985), *review denied*, 105 Wn.2d 1008 (1986)).[16]

By virtue of the security interest, the Bank had "some property interest" in the proceeds from the sale of sand sufficient to maintain a conversion action. *Cf. Michel*, 70 Wn. App. at 379 (existence of landlord crop lien would have supported action for conversion of crops had the lien been proven).[17]

■■■ Meyers Way argues that the Bank was not entitled to sand sale proceeds because it received the full value of its indebtedness at the foreclosure. Meyers Way's premise rests on the assumption that the Bank was not entitled to claim default interest. If the Bank was entitled to default interest, then the purchase price at the trustee's sale was insufficient to cover the full value of the borrowers' indebtedness. With such a deficiency, the Bank could sue third parties to recover the deficiency. *See Glenham v.*

---

[16]This is the position advocated by Prosser, who criticizes the immediate possession rule as archaic and formalistic. W. Page Keeton. et al., *Prosser and Keaton on the Law of Torts*, § 15, at 90 (5th ed. 1984).

[17]We conclude that the Bank nevertheless had the right to immediate possession of the proceeds from the sales of sand. The security stated in the security agreement is the proceeds from sand sales. Thus, the moment the borrowers or Meyers Way received any money in exchange for sand, that money was subject to a security interest.

Palzer, 58 Wn. App. 294, 297-98, 792 P.2d 551 (1990) (nonjudicial foreclosure prohibition on recovering a deficiency judgment does not preclude creditor from suing, in tort, third parties who are not obligors of the debt secured by the deed of trust). Meyers Way and Neeser were not obligors on the debt secured by the deed of trust and, therefore, were third parties who could be sued for conversion.[18]

## III
### ATTORNEY FEES

We award fees on appeal to the Bank from Jardine and Rupeiks, as provided by the loan documents. RCW 4.84-.330; RAP 18.1(a).

Affirmed.

WEBSTER and COX, JJ., concur.

Reconsideration denied March 18, 1996.

Review denied at 130 Wn.2d 1015 (1996).

[18]Meyers Way argues that the Bank is estopped from taking the position that no default interest would be sought at the TRO proceeding, and then later asserting a claim for conversion, naming as a deficiency the failure to acquire default interest. A party cannot assert one position in a prior suit between itself and another party, and then in a subsequent suit plead matters inconsistent with the first position. *Witzel v. Tena*, 48 Wn.2d 628, 632, 295 P.2d 1115 (1956). The Bank agreed to forego bidding default interest only if the sale was held on the scheduled date of August 17. The sale was not held on that date. Thus, the Bank is not estopped from requesting default interest again after the motion for the TRO was denied. These facts also rebut Meyers Way's argument that the Bank waived its right to collect default interest.