**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

COTO SETTLEMENT,
          *Plaintiff-Appellant,*

v.

IAN EISENBERG and OLYMPIC
TELECOMMUNICATIONS, INC.,
          *Defendants-Appellees..*

No. 08-35966

D.C. No.
08-cv-00125-RSM

OPINION

Appeal from the United States District Court
for the Western District of Washington
Ricardo S. Martinez, District Judge, Presiding

Argued and Submitted
October 14, 2009—Seattle, Washington

Filed January 29, 2010

Before: Richard D. Cudahy,* Senior Circuit Judge,
Johnnie B. Rawlinson and Consuelo M. Callahan,
Circuit Judges.

Opinion by Judge Cudahy

*The Honorable Richard D. Cudahy, Senior United States Circuit Judge
for the Seventh Circuit, sitting by designation.

1763

**COUNSEL**

Ernst Leonard, Friedman & Feiger, L.L.P., Dallas, Texas, and Jeremy Robert Larson, Foster Pepper & Shefelman, Seattle, Washington, for the appellant.

Derek A. Newman and Derek Linke, Newman & Newman, Attorneys at Law, Seattle, Washington, for the appellees.

**OPINION**

CUDAHY, Circuit Judge:

The question presented here is whether the district court erred in dismissing the claims of Coto Settlement (Coto) as barred by the statute of limitations. Coto claims that it is entitled to part of $1.4 million refunded by the Federal Trade Commission (FTC) following a judgment against Coto, Ian Eisenberg and other entities. Eisenberg and Olympic Telecommunications, Inc. (Olympic), owned by Eisenberg, contend that, if Coto had a claim for conversion of those funds, it accrued in 2000, and is therefore time-barred. Coto maintains instead that its claims did not accrue until 2007, when the FTC announced that it would refund the sum to Eisenberg and Olympic. Coto characterizes the dispute in 2000 as one regarding the proper management of the funds rather than

their ownership but, for the following reasons, we disagree. We note at the outset that the basis for this conclusion requires reliance on documents and arguments not adequately discussed by the parties in briefing or at oral argument. In the interests of justice, however, we will raise and discuss these arguments on our own. However, it is not the task of courts to make cases for the parties, and we find the presentation of this case unsatisfactory in the extreme.

# I

## A

Our appellate jurisdiction rests on 28 U.S.C. § 1291 and the action below arose in diversity, 28 U.S.C. § 1332. The case was filed in King County Superior Court, where the court granted a temporary restraining order in favor of Coto, requiring the defendants to deposit certain contested funds into the registry of the Superior Court. Before the hearing on a preliminary injunction, the matter was removed, improperly under the forum defendant rule. Coto, however, failed to timely object to removal, and we retain jurisdiction. *See Lively v. Wild Oats Markets, Inc.*, 456 F.3d 933, 942 (9th Cir. 2006) (holding that improper removal is a waivable defect). Later, upon motion, the district court dismissed Coto's claims.

## B

We review *de novo* a district court's disposition of a motion to dismiss pursuant to Rule 12(b)(6). A complaint may survive a motion to dismiss if, taking all well-pleaded factual allegations as true, it contains "enough facts to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "[W]e do not necessarily assume the truth of legal conclusions merely because they are cast in the form of factual allegations." *Paulsen v. CNF, Inc.*, 559 F.3d 1061, 1071 (9th Cir. 2009) (citing *Cedars-Sinai Med.*

*Ctr. v. Nat'l League of Postmasters of the U.S.*, 497 F.3d 972, 975 (9th Cir. 2007)).

**C**

Christopher L. Hebard, Coto's beneficiary, and Eisenberg, who has some interest in French Dreams Investments, N.V. (French Dreams), created Electronic Publishing Ventures, LLC (EPV) in 1998. EPV, a Delaware holding company, owned several entities that offered internet services, and Hebard and Eisenberg shared general supervisory and oversight responsibilities for the EPV entities. The EPV entities charged their clients through telephone billings and used Olympic to process the billing data and to collect payments from the telephone companies. In the summer of 2000, Hebard and Eisenberg shut down the programs because of a dispute. Also that summer, Eisenberg announced that Olympic, which is owned or controlled by him, would increase its reserve level to 100% of the funds billed by the EPV entities. As of December 2000, according to allegations in the Complaint, Olympic held approximately $5 million in reserves, purportedly for the EPV entities. In contrast, however, a Billing Services Agreement between Olympic and the EPV entities specifies that, before Olympic remits funds received from the EPV entities' customers to the EPV entities, Olympic subtracts funds for a "bad debt reserve" and for "chargeback reserves", used to cover certain charges for customers who do not pay their bills and for customers whose charges Olympic has chosen to forgive. Olympic remits the "net funds," or the payments received from the telephone companies less these reserves and other fees and taxes. The Billing Agreement clarifies that, for the bad debt reserves, if the telephone company discovers that it has any overage allocated to the bad debt reserves, Olympic will remit that amount to the customer. Olympic, however, is responsible for the chargeback reserves and may adjust them in its sole discretion. The Billing Agreement notes that the chargeback reserves are merely an estimate that does not "in any way limit Olympic's rights to

recourse, reimbursement and set-off against [the EPV entities] . . . for all sums due by [the EPV entities] to Olympic under this Agreement, including without limitation the actual chargeback, unbillable and returns activity for [the EPV entities] aggregate call records." In 2000, Hebard strongly objected to Olympic's decision to increase the reserves to 100%, but Olympic declined to refund any of this amount.

In October 2000, the FTC filed an action against the EPV entities, Eisenberg, French Dreams, Hebard and Coto (the FTC defendants), who were found to have mailed deceptive offers to provide internet services.[1] During the FTC action, the EPV entities were all dissolved and their charters revoked by November 2005.[2] In March 2004, the FTC found the defendants liable in the amount of $17 million subject to a refund of any money not needed for consumer redress. Hebard tendered $80,000, Olympic $2,152,694, and Eisenberg, $629,513.85, all deposited into the registry of the court in the FTC action in June 2006. The FTC determined that the actual liability was less than the sums tendered by the parties. In 2007, therefore, responding to a motion by Eisenberg and Olympic, the FTC announced that it would refund $1.4 million to them. Coto sent a demand letter in October 2007 to Eisenberg and Olympic asking whether any of the funds tendered by Olympic were property of the former EPV entities and requesting an accounting of the use and disposition of all reserve funds. Eisenberg and Olympic did not respond. The judge in the FTC action held that determining the ownership of the refunded amounts was outside the scope of his jurisdiction and, therefore, as far as the FTC court was concerned, the funds belonged to Eisenberg and Olympic, and, in any event, the funds were no longer within that court's possession or control.

---

[1] *FTC v. Cyberspace.com, L.L.C.*, C.A. No. C00-1806RSL, *aff'd*, 453 F.3d 1196 (9th Cir. 2006); 195 Fed. App'x. 544 (9th Cir. July 13, 2006) (not designated for publication).

[2] The first entity's certificate of authorization was revoked in November 2000 and the last in November 2005.

Coto responded by filing this action. It asserted three claims for relief: breach of fiduciary duty, money had and received (an action incidental to unjust enrichment, *Davenport v. Washington Educ. Ass'n*, 197 P.3d 686, 698-99 (Wash. Ct. App. 2008)) and conversion. In addition, Coto sought the imposition of a constructive trust (a form of equitable relief, *Venwest Yachts, Inc. v. Schweickert*, 176 P.3d 577, 582 n.5 (Wash. App. 2008)), an accounting (another equitable remedy, *Saletic v. Stamnes*, 51 Wn.2d 696, 698 (Wash. 1958)), as well as declaratory and injunctive relief.

The district court dismissed Coto's Amended Complaint and denied its motion for a preliminary injunction on the pleadings as time-barred because the court held that Coto's claims for relief arose in the summer of 2000 when Hebard objected to Eisenberg and Olympic's decision to raise the reserve requirement to 100%. The district court rejected Coto's efforts to cast Olympic's decision to require reserves of 100% as a well-intentioned management decision to accumulate reserves to pay an eventual FTC judgment that would be released back to the EPV entities if the reserve level was set too high. The district court noted that the FTC did not file its suit until the fall of 2000, months after the reserve requirement was increased. Because we find that Olympic's actions in raising the reserve requirement gave rise to Coto's claims in 2000, and therefore that the statute of limitations began to run at that time, we affirm.

## II

Coto argues that it has standing to assert its claims against Appellees because it is a shareholder asserting the claims of the now-dissolved EPV entities. Coto contends that it is a basic tenet of corporate jurisprudence that the property rights of a corporation pass to the shareholders after dissolution. Although Appellees do not reject this standing argument and the district court did not address it in its order, it is jurisdictional, Coto raised it in its opening brief and we consider it

here. *See, e.g., Jacobs v. Clark County Sch. Dist.*, 526 F.3d 419, 437-38 (9th Cir. 2008). The test for standing appears in the familiar language of *Lujan v. Defenders of Wildlife*, requiring a party to show three things:

> First, [it] must have suffered an injury in fact-an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of . . . . Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

504 U.S. 555, 560-61 (1992) (internal citations omitted); *see also D'Lil v. Best Western Encina Lodge & Suites*, 538 F.3d 1031, 1036 (9th Cir. 2008).

**[1]** Coto argues that it has the right to claim property formerly belonging to the EPV entities because a shareholder of a dissolved corporation has standing to assert claims for the property of the corporation after the property passes to the shareholders. While a corporation remains in existence, on the other hand, as specified by corporation continuance statutes, shareholders do not have standing to assert the claims of the corporation, unless they do so through derivative actions. *See, e.g., RK Ventures, Inc. v. City of Seattle*, 307 F.3d 1045, 1057 (9th Cir. 2002) (holding that injury to the corporation is not injury to the shareholders for purposes of standing, although a shareholder who is injured separately from the corporation's injury has standing apart from the corporation); *United States v. Stonehill*, 83 F.3d 1156, 1160 (9th Cir. 1996) (explaining that "[w]ell-established principles of corporate law prevent a shareholder from bringing an individual direct cause of action for an injury done to the corporation or its property by a third party").

**[2]** After a specified period post-dissolution, however, the corporation ceases to exist. In each of the states in which the

EPV entities were incorporated, after dissolution, the LLC continues to exist for a limited period as an entity that may sue (through members and managers or others in derivative actions) and be sued. *See* Nev. Rev. Stat. § 86.505 (LLC may sue and be sued until 2 years after dissolution); Del. Code Ann. tit. 6, § 18-803 (until the certificate of cancellation is filed); Mont. Code Ann. § 35-8-909 (until five years after the publication of a notice of the company's dissolution).

[3] The disposition of assets after an LLC is wound up typically depends on the operating agreement entered into by the owners. The EPV entities were registered in Nevada, Delaware and Montana. Those states provide by statute specific procedures for distributing assets and assigning the liabilities of the LLCs after dissolution that rely, in part, upon the procedures spelled out in the operating agreements of the LLCs. *See, e.g.*, Del. Code Ann. tit. 6, § 18-804(a); Mont. Code Ann. § 35-8-905; Nev. Rev. Stat. § 86.521.[3] This court is not in possession of the operating agreements of the EPV entities effective at the time these entities were dissolved. But we may reasonably conclude that, absent the FTC action, some of the remaining assets of the EPV entities (if there were any assets) would have flowed to their 50 percent owner, Coto, upon the entities' dissolution. Perhaps this absence of key information explains Appellees' failure to object to standing on appeal and to advance their standing arguments in their response brief.[4] For purposes of the present appeal, we make the reasonable assumption that Coto has standing based on assets it allegedly expected to receive after the release of the Olympic funds and the dissolution of the EPV entities by the time Coto filed its lawsuit.

---

[3]The EPV entities were dissolved at different times during the pendency of the FTC action. The Delaware Secretary of State revoked the corporate charter of EPV in June 2003 and that of Essex in June 2004, the Montana Secretary of State revoked the certificate of authority for Cyberspace in November 2000 and the Nevada Secretary of State revoked the corporate charter of Surfnet in November 2005.

[4]The standing issue was not discussed at oral argument.

## III

Coto includes the Billing Services Agreement in the record on appeal. This Agreement governs the billing and collection services that Olympic provided the EPV entities. This contract was discussed in Coto's response to defendants' motion to dismiss, but the Billing Agreement was first presented to the district court attached to Coto's Motion for New Trial that the district court summarily denied because it found that it lacked jurisdiction while the case was on appeal. Consequently, in the order now on appeal, the district court did not rely on the Billing Agreement, and the parties on appeal have for the most part ignored this document.

On a motion to dismiss, we may consider materials incorporated into the complaint or matters of public record. *See Intri-Plex Technologies, Inc. v. Crest Group, Inc.*, 499 F.3d 1048, 1052 (9th Cir. 2007); *cf.* Fed. R. Civ. P. 12(d) (explaining that, should the district court decide to consider other materials, the motion is converted into a motion for summary judgment and the opposing party given reasonable time to respond); *Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001) (noting that a district court may not take judicial notice of a disputed fact in a public record). We have extended the doctrine of incorporation by reference to consider documents in situations where the complaint necessarily relies upon a document or the contents of the document are alleged in a complaint, the document's authenticity is not in question and there are no disputed issues as to the document's relevance. *See Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005); *Parrino v. FHP, Inc.*, 146 F.3d 699, 705, 706 n.4 (9th Cir. 1998), *rev'd by statute on other grounds*; *Faulker v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006); *International Audiotext Network v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995) (considering an agreement that was not specifically incorporated into the complaint because the complaint "relies heavily upon its terms and effect" such that the agreement is "integral" to the complaint). But the mere mention of the exis-

tence of a document is insufficient to incorporate the contents of a document. *See United States v. Ritchie*, 342 F.3d 903, 908-09 (9th Cir. 2003).

Here, the Amended Complaint does not explicitly refer to the Billing Agreement, but it contains allegations that the EPV entities used Olympic to handle their billings and that Olympic "held reserves from the EPV entities in an amount necessary to cover contingent liabilities associated with the marketing programs." Appellees do not contend that the Billing Agreement provided in the record is not authentic. Whether or not Olympic converted the reserves it received from the EPV entities' customers (for purposes of triggering the statute of limitations) depends in large part on its authorization to do so and whether it asserted ownership over the funds at that time—suggesting that the Billing Agreement is integral to the Amended Complaint.[5]

## IV

Because we must determine the limitations issue in accordance with Washington law, the applicable statute of limitations for all of Coto's claims for relief is three years. RCW 4.16.080[6]; *Louisiana-Pacific Corp. v. ASARCO, Inc.*, 24 F.3d 1565, 1580 (9th Cir. 1994); *Hudson v. Condon*, 6 P.3d 615, 619 (Wash. Ct. App. 2000).[7] The statute of limitations begins

---

[5]The Agreement provides:

> Olympic will remit funds received from the LECs to [EPV] or its designated payee as provided herein . . . Olympic shall perform the settlement accounting in accordance with the above outlined calculation, subject to any reserve adjustments pursuant to this Section 2, which Olympic shall be entitled to adjust from time to time, in its sole discretion, based on actual chargebacks, chargeback history, levels of client's business and other relevant conditions.

[6]The statute of limitations for an action arising out of a contract dispute is six years. RCW 4.16.040.

[7]We note that the Billing Services Agreement contains a mandatory arbitration clause for "any controversy or claim arising out of or related

to run when the plaintiff knew or should have known all of the essential elements of its applicable cause of action. *Louisiana-Pacific Corp.*, 24 F.3d at 1580 (citing *Rose v. A.C. & S., Inc.*, 796 F.2d 294, 296 (9th Cir. 1986)).

**A**

**[4]** Conversion consists of an unjustified, willful interference without lawful justification, whereby a person entitled to it is deprived of the possession of his or her property. *See, e.g.*, *Potter v. Washington State Patrol*, 196 P.3d 691, 696 (Wash. 2008); *Western Farm Service, Inc. v. Olsen*, 90 P.3d 1053, 1054 n.1 (Wash. 2004). The plaintiff must establish (or here, plead) that it has "some property interest in the goods allegedly converted." *Meyers Way Dev. Ltd. Partnership v. Univ. Savings Bank*, 910 P.2d 1308, 1320 (Wash. Ct. App. 1996) (quoting *Michel v. Melgren*, 853 P.2d 940, 943 (Wash. Ct. App. 1993)). Money may be the subject of conversion if the party charged with conversion wrongfully received the money or had an obligation, which it failed to honor, to return the specific money to the party claiming it. *See, e.g.*, *Public Utility Dist. 1 of Lewis County v. Wash. Public Power Supply System*, 705 P.2d 1195, 1211 (Wash. 1995); *Davenport v. Wash. Educ. Ass'n*, 197 P.3d 686, 695 (Wash. Ct. App. 2008).

**[5]** Coto contends that the reserves held by Olympic were impressed with a resulting trust for the benefit of the now-dissolved EPV entities and that Olympic in 2000 asserted no claim of ownership to the funds, and therefore did not convert

to this Agreement." As no party has discussed the applicability of this clause, however, we will not discuss its possible application. *See Sovak v. Chugai Pharmaceutical Co.*, 280 F.3d 1266, 1269-70 (9th Cir. 2002) (holding that federal law governs waiver of an arbitration clause); *see also Britton v. Co-op Banking Group*, 916 F.2d 1405, 1413 (9th Cir. 1990) (explaining that the Federal Arbitration Act confers only the right to obtain an order to compel arbitration, not an unqualified right to compel arbitration of any dispute at any time).

them, until 2007. A resulting trust arises when the person with legal title is not the person advancing consideration for the property—the person with legal title is presumed to hold it subject to the equitable ownership of the purchaser, absent contrary intent. *See In re Spadoni's Estate*, 430 P.2d 965, 967 (Wash. 1967). A resulting trust is formed only on the basis of circumstances that create an inference that the parties intended to create a trust. *See Thor v. McDearmid*, 817 P.2d 1380, 1388 (Wash. Ct. App. 1991). The trust must eventually be proven by clear, cogent and convincing evidence. *See In re Spadoni's Estate*, 430 P.2d at 967. For example, the Supreme Court of Washington affirmed a trial court's finding of a resulting trust in favor of a utility company's shareholders when the company declared dividends for its shareholders and established a separate bank account for the funds. *See Dep't of Revenue v. Puget Sound Power & Light Co.*, 694 P.2d 7, 12 (Wash. 1985). Given the facts alleged here, however, it is not plausible that Olympic held a resulting trust for the benefit of the EPV entities. Instead, it is clear from the Billing Agreement that Olympic intended to retain reserves to compensate for amounts that are uncollectible from the EPV entities' customers—not to hold them for the EPV entities' later benefit.

**[6]** Even if Olympic did hold the reserves as a resulting trust, it repudiated that trust in 2000. The statute of limitations begins to run when the possessor of the property repudiates, or the plaintiff should have discovered a repudiation of, the claimant's right to the property. *See Goodman v. Goodman*, 907 P.2d 290, 294 (Wash. 1995); *Brougham v. Swarva*, 661 P.2d 138, 142 (Wash. Ct. App. 1983). A repudiation occurs when the trustee, by words or other conduct, denies there is a trust and claims the trust property as its own. *Goodman*, 907 P.2d at 294 (internal citations omitted). "The repudiation must be plain, strong, and unequivocal." *Id.*; *Puget Sound Power & Light Co.*, 694 P.2d at 12-13 (holding that repudiation occurred at the earliest at the date of the statutory presumption of abandonment); *Skok v. Snyder*, 733 P.2d 547, 550 (Wash.

Ct. App. 1987) (noting that a trustee's continued acknowledgment of the trust is regarded as strongly indicating that he has not repudiated it); *O'Steen v. Wineberg's Estate*, 640 P.2d 28, 34 (Wash. Ct. App.1982) (trust not repudiated based on the trustee's inventory of the trust's property, although that may be a sign that the trustee considered the property his own, it was not clear and unequivocal).

[7] In the present case, in 2000, Coto objected to Olympic's decision to raise the reserves. While Coto does not plead that Olympic clearly stated to Coto that the reserves were its property, it inferred as much when Olympic declined to return the funds. Moreover, the Billing Agreement indicates that Olympic subtracts its reserves from the net funds to be disbursed to the EPV entities and, therefore, when it declares a reserve requirement, it is also declaring that it intends to withhold the funds from the EPV entities indefinitely. The EPV entities' marketing programs were shut down in 2000 and, consequently, Olympic's decision to raise the reserve requirement that summer was its final decision as to the reserves.

It is not surprising, therefore, that Coto's beneficiary objected to Olympic's actions by filing a conversion claim on behalf of EPV in 2000. Included in the record on appeal are several filings related to a bankruptcy in the Northern District of Texas Bankruptcy Court, purportedly filed by EPV. In an adversarial proceeding brought in the bankruptcy court in November 2000, EPV filed a complaint alleging a conversion claim against Olympic based on "[t]he method and manner in which Olympic has retained the approximately $9 million in funds in violation of the Billing Services Agreement." *See Electronic Publishing Ventures, L.L.C. v. Olympic Telecommunications, Inc.*, Adversary Proc. No. 00-03574-hca, Doc. No. 1 (Bankr. N. D. Tex. Nov. 21, 2000).[8] EPV pleaded that

---

[8] The Court notes that the attorney currently representing Coto was representing EPV in that adversarial proceeding, which was dismissed for want of prosecution.

it "has made demand upon Olympic for the return of such funds, and such demand was refused. Accordingly, EPV requests judgment against Olympic for the value of the money and property which it has wrongfully assumed and exercised control over." *Id.*

**[8]** Eisenberg and Olympic did not raise the above-described complaint in the bankruptcy proceeding in the proceedings below, in briefing here, or at oral argument.[9] While not relying on this bankruptcy complaint for the truth of the allegations in it, we note that it provides additional support for our conclusion that, in 2000, Coto (then on behalf of EPV) knew or should have known of all the existence of the elements of a conversion claim, that is, at that time, Olympic intended to retain the reserves and would not be disbursing them to the EPV entities. Coto's conversion claim thus arose in 2000 and is, therefore, time barred.

**B**

**[9]** A claim of money had and received is another name for a common law action for restitution. *Davenport v. Washington Educ. Ass'n*, 197 P.3d 686, 696 (Wash. Ct. App. 2008). It may apply when conversion does not, in cases when "the defendant has received money which in equity and good conscience should have been paid to the plaintiff, and under such circumstances that he ought, by the ties of natural justice, to pay it over." *Id.* at 697 (internal quotations omitted). The law of restitution requires only that the transferee have received the property of another under circumstances that result in the transferee's unjust enrichment. *Id.* at 698-99. Then, restitution

---

[9]Coto attached an unfiled copy of the complaint in the adversary proceeding (which was later filed, according to records from the Texas bankruptcy court) to its Motion for New Trial. In its Motion, Coto explained that, when it filed the complaint, it had not yet learned that, contrary to defense counsel's initial assertion that Olympic held no reserves, it actually had $3.6 million of reserves, purportedly for the EPV entity Cyberspace, alone.

applies to recover the gain acquired by the defendant through the wrongful act as opposed to seeking damages to recover for the harm done to the plaintiff. *See* GEORGE E. PALMER, LAW OF RESTITUTION § 2.1, at 53 (1978 & Supp. 2010). Unjust enrichment is essentially another way of stating a tort claim and, consequently, once the underlying tort claim is dismissed, so is the unjust enrichment claim. *See id.* Here, Coto's "money had and received" claim appears to be an echo of its conversion claim, and for the reasons discussed above, is also barred by the statute of limitations.

## C

**[10]** Coto's third claim for relief is one for breach of fiduciary duty based on Appellees' role as "trustee" of the resulting trust discussed above. A fiduciary relationship does not exist on the basis of an arm's length business transaction, unless provided for by contract. *See, e.g.*, *Maginnis v. Simmons*, 286 P.2d 102, 104 (Wash. 1955). A claim for a breach of fiduciary duty exists when there is a duty and the breach was the proximate cause of losses sustained. *See, e.g.*, *Senn v. Northwest Underwriters, Inc.*, 875 P.2d 637, 639 (Wash. Ct. App.1994). As Coto averred, in 2000, it objected to the reserve level as improper and all the elements of a breach of fiduciary duty were present at that time—if at all. Unlike the conversion claim, the breach of fiduciary duty claim does not depend on whether Olympic asserted ownership over the funds— only whether it acted as a fiduciary should have in the best interest of those to whom it owed a duty. As Coto notes, it could have also brought a claim based on mismanagement of the reserves in 2000. The district court's order will therefore be affirmed as to this claim for relief.

**[11]** Coto's remaining "claims" are in fact equitable remedies that were properly disposed of by the district court given that Coto's claims for relief were dismissed. Accordingly, the judgment of the district court is **AFFIRMED**.