[No. 42360-0-II.   Division Two.   October 30, 2012.]

RELIABLE CREDIT ASSOCIATION, INC., *Appellant*, v. PROGRESSIVE DIRECT INSURANCE COMPANY, *Respondent*.

632

*Andrew T. Reilly* (of *Black Helterline LLP*), for appellant.

*Douglas F. Foley* (of *Douglas Foley & Associates, PLLC*) and *Vernon S. Finley*, for respondent.

¶1 VAN DEREN, J. — Reliable Credit Association Inc. appeals the trial court's order denying its motion for partial summary judgment and granting summary judgment to Progressive Direct Insurance Company. Progressive denied Reliable's claim as a secured lienholder under Chad Grauel's vehicle insurance policy after he intentionally destroyed the vehicle securing Reliable's loan to Grauel. The trial court held that Reliable was not entitled to payment under Progressive's vehicle policy provision excluding coverage for a lienholder based on a policyholder's "conversion," "embezzlement," or "secretion" of the insured

vehicle. Reliable argues that the trial court erred by granting summary judgment to Progressive because the terms "conversion" and "secretion" in its exclusionary clause are ambiguous, thus entitling it to recovery.

¶2 Because the terms "conversion" and "secretion" in the vehicle insurance policy language mandated by statute and the insurance commissioner are subject to more than one reasonable interpretation, we hold that the policy language is ambiguous and construe it against Progressive and in favor of coverage for Reliable. We reverse the trial court's summary judgment order denying coverage, remand for entry of summary judgment for Reliable, and award fees for trial and appeal to Reliable under *Olympic Steamship*.[1]

## FACTS

¶3 The material facts are undisputed.[2] In August 2009, Chad Grauel purchased a 2000 BMW 328 CI, valued in excess of $12,000.00, using a combination of his funds and a $10,729.82 loan from Reliable. Progressive issued an insurance policy to Grauel naming Reliable as lienholder and additional insured/loss payee.

¶4 On or about November 16, 2009, Grauel's vehicle was destroyed by fire. In response to a report of a fire on a vacant lot, fire fighters from the Vancouver Fire Department discovered the burned vehicle, abandoned and stripped of parts. The following day, Grauel reported to police that the vehicle had been stolen. He stated that he parked the vehicle at a friend's apartment complex several days before the theft to allow his friend to use it and that he placed the key in a magnetic box underneath the vehicle. Grauel's friend later reported to police that he did not know why Grauel had left him the vehicle, and another witness reported that Grauel

---

[1] *Olympic S.S. Co. v. Centennial Ins. Co.*, 117 Wn.2d 37, 54, 811 P.2d 673 (1991).

[2] "There are no factual disputes on the matters at issue." Br. of Appellant at 10. "There was no issue of fact that would preclude the grant of Summary Judgment." Br. of Resp't at 13.

had never placed the key under the car, explaining it as a "ruse related to a pre-planned fraudulent insurance claim." Clerk's Papers (CP) at 86.

¶5 On April 8, 2010, the State charged Grauel with second degree arson; willful destruction, injury, or secretion of insured property; and making a false insurance claim. On September 2, 2010, Grauel pleaded guilty to first degree reckless burning[3] and to filing a false insurance claim or proof of loss exceeding $1,500.[4]

¶6 Grauel's insurance policy with Progressive provided comprehensive coverage for damage to the vehicle,[5] but it specifically excluded coverage to the policyholder for dam-

---

[3] RCW 9A.48.040 provides:

(1) A person is guilty of reckless burning in the first degree if he or she recklessly damages a building or other structure or any vehicle, railway car, aircraft, or watercraft or any hay, grain, crop, or timber whether cut or standing, by knowingly causing a fire or explosion.

(2) Reckless burning in the first degree is a class C felony.

[4] RCW 48.30.230 provides:

(1) It is unlawful for any person, knowing it to be such, to:

(a) Present, or cause to be presented, a false or fraudulent claim, or any proof in support of such a claim, for the payment of a loss under a contract of insurance; or

(b) Prepare, make, or subscribe any false or fraudulent account, certificate, affidavit, or proof of loss, or other document or writing, with intent that it be presented or used in support of such a claim.

(2)(a) Except as provided in (b) of this subsection, a violation of this section is a gross misdemeanor.

(b) If the claim is in excess of one thousand five hundred dollars, the violation is a class C felony punishable according to chapter 9A.20 RCW.

[5] The policy provides in relevant part:

PART IV—DAMAGE TO A VEHICLE

. . . .

INSURING AGREEMENT— COMPREHENSIVE COVERAGE

If **you** pay the premium for this coverage, **we** will pay for sudden, direct, and accidental loss to a:

1. **covered auto**, including an attached **trailer**; or

2. **non-owned auto**;

and its **custom parts or equipment**, that is not caused by **collision**.

CP at 18.

age caused by the policyholder's own criminal activity.[6] Progressive's "Lienholder Agreement" under the policy protected the lienholder's ability to recover as a loss payee if the policyholder damaged the insured vehicle, except in cases of "conversion, embezzlement or secretion" of the vehicle by the policyholder. CP at 21.

¶7 The Lienholder Agreement provides:

1.  Loss or damage, if any, under this policy will be payable first to the loss payee or mortgagee (hereinafter called "secured party"), and second, to **you** as the interests of each may appear; PROVIDED, that, upon demand for separate settlement by the secured party, the amount of said loss will be paid directly to the secured party to the extent of its interest.

2.  This insurance as to the interest of the secured party will not be invalidated by any act or neglect of **you** or **your**[7] agents, employees or representatives, nor by any change in the title or ownership of **your covered auto**; PROVIDED, HOWEVER, that the *conversion, embezzlement or secretion* by **you** or **your agents**, employees or representatives is not covered under said policy unless specifically insured against and premiums paid therefor.

---

[6] Part IV of the policy provides:

**EXCLUSIONS** . . . .
Coverage under this Part IV will not apply for loss:

. . . .
13. to any vehicle caused by, or reasonably expected to result from, a criminal act or omission of **you**, a **relative**, or the owner of a **non-owned auto**. This exclusion applies regardless of whether **you**, the **relative**, or the owner of the **non-owned auto** is actually charged with, or convicted of, a crime.

CP at 20 (underline omitted).

[7] The "General Definitions" section of the policy provides:

12. "**You**" and "**your**" mean:

a. a person shown as a named insured on the **declarations page**; and
b. the spouse of a named insured if residing in the same household.

CP at 13-14.

CP at 21 (italics added). Washington law requires insurers to include the above provisions in their policies,[8] but the statutes do not define the terms "conversion," "embezzlement," or "secretion." RCW 48.18.125; WAC 284-21-010, -990. Progressive's insurance policy also fails to define any of these terms.

¶8 Shortly after the vehicle's destruction, Reliable tendered a claim to Progressive under Grauel's policy. Progressive denied Reliable's claim in a letter dated February 17, 2010. The letter concluded that "[b]ased on our investigation, we do not believe that this incident was a sudden, direct, and accidental loss. Therefore, Progressive Direct Insurance Co. will not make any payments on this claim." CP at 27-28. The letter purportedly referenced a "Loss Payable Clause" in the policy that stated, "[P]rotection under this clause does not apply in any cause of conversion, embezzlement, secretion *or willful damaging or destruction*, of the covered auto by or at the direction of you, a relative, or the owner of the covered auto." CP at 27

---

[8] RCW 48.18.125 authorizes the state insurance commissioner to "adopt standard forms for loss payable and mortgagee clauses for property and automobile physical damage insurances. . . . Following the adoption of such forms, no insurer authorized to do business in the state shall use any form other than those so adopted." WAC 284-21-010 provides:

After March 1, 1968, no new policy of automobile physical damage insurance or property insurance covering property located in the state of Washington shall be endorsed with a long form loss payable or mortgagee clause, other than:

(1) For automobile physical damage insurance, the form attached to this regulation, which is here designated Form REG-335.

Form REG-335 can be found within WAC 284-21-990, which provides:

1. Loss or damage, if any, under this policy shall be payable first to the loss payee or mortgagee (hereinafter called secured party), and, second, to the insured, as their interests may appear; Provided, [t]hat, upon demand for separate settlement by the secured party, the amount of said loss shall be paid directly to the secured party to the extent of its interest.

2. This insurance as to the interest of the secured party shall not be invalidated by any act or neglect of the insured named in said policy or his agents, employees or representatives, nor by any change in the title or ownership of the insured property: Provided, however, [t]hat, the conversion, embezzlement or secretion by the named insured or his agents, employees or representatives is not covered under said policy unless specifically insured against and premiums paid therefor.

(emphasis added). But the quoted language does not actually appear within the policy; accordingly, Progressive later clarified that denial of coverage was based on the Lienholder Agreement's exclusion for "conversion," "embezzlement," or "secretion."

¶9 Reliable sued for declaratory judgment, alleging breach of insurance contract, bad faith, and Consumer Protection Act[9] violations. Reliable moved for partial summary judgment, asserting that Progressive improperly denied Reliable's claim as a matter of law because Grauel's acts did not constitute "conversion," "embezzlement," or "secretion" as provided in the policy. Progressive also moved for summary judgment. The trial court denied Reliable's motion and granted Progressive's. Reliable appeals.

ANALYSIS

I. STANDARD OF REVIEW

A. Summary Judgment

¶10 We review a trial court's summary judgment ruling de novo, engaging in the same inquiry as the trial court. *Quadrant Corp. v. Am. States Ins. Co.*, 154 Wn.2d 165, 171, 110 P.3d 733 (2005). Summary judgment is proper when the pleadings, depositions, and admissions on file—together with the affidavits, if any—show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *See* CR 56(c). In determining whether summary judgment was proper, we "must consider the facts submitted and all reasonable inferences from those facts in the light most favorable to the nonmoving party." *Humleker v. Gallagher Bassett Servs., Inc.*, 159 Wn. App. 667, 674, 246 P.3d 249, *review denied*, 171 Wn.2d 1023 (2011). "Summary judgment is proper only if, from all the evidence, reasonable persons could reach but one conclu-

[9] Ch. 19.86 RCW.

sion." *Humleker*, 159 Wn. App. at 674. Because the parties agree that there are no issues of material fact, we need determine only whether Reliable is entitled to judgment as a matter of law.

B. Insurance Policy Interpretation

■■■ ¶11 "Interpretation of an insurance policy is a question of law, which we review de novo." *Hall v. State Farm Mut. Auto. Ins. Co.*, 133 Wn. App. 394, 399, 135 P.3d 941 (2006). Insurance policies are contracts; thus, rules of contract interpretation apply to our analysis. *Hall*, 133 Wn. App. at 399. When interpreting an insurance policy, we consider the policy as a whole and arrive at a " 'fair, reasonable, and sensible construction as would be given to the contract by the average person purchasing insurance.' " *Quadrant*, 154 Wn.2d at 171 (internal quotation marks omitted) (quoting *Weyerhaeuser Co. v. Comm'l Union Ins. Co.*, 142 Wn.2d 654, 666, 15 P.3d 115 (2000)).

¶12 If the language in an insurance policy is unambiguous, "we must enforce it as written; we may not modify it or create ambiguity where none exists." *Quadrant*, 154 Wn.2d at 171. Upon determining that a provision is ambiguous,

> we may rely on extrinsic evidence of the intent of the parties to resolve the ambiguity. [*Weyerhaeuser*, 142 Wn.2d at 666]. Any ambiguity remaining after examination of the applicable extrinsic evidence is resolved against the insurer and in favor of the insured. [*Weyerhaeuser*, 142 Wn.2d at 666]. But while exclusions should be strictly construed against the drafter, a strict application should not trump the plain, clear language of an exclusion such that a strained or forced construction results. [*Weyerhaeuser*, 142 Wn.2d at 666].

*Quadrant*, 154 Wn.2d at 172.

■■ ¶13 " '[E]xclusionary clauses are to be most strictly construed against the insurer.' " *Am. Best Food, Inc. v. Alea London, Ltd.*, 168 Wn.2d 398, 406, 229 P.3d 693 (2010) (alteration in original) (quoting *Phil Schroeder, Inc. v. Royal Globe Ins. Co.*, 99 Wn.2d 65, 68, 659 P.2d 509 (1983)). Where

there is room for two constructions of an exclusionary clause, one favorable to the insured and one favorable to the insurer, courts must adopt the construction favorable to the insured. *Murray v. W. Pac. Ins. Co.*, 2 Wn. App. 985, 992, 472 P.2d 611 (1970).

¶14 Progressive argues initially that we must ignore the normal standards of interpretation of insurance policies because "the language in the endorsement is required by statute and administrative rule." Br. of Resp't at 11. It further asserts that the plain meaning of WAC 284-21-990 is not ambiguous and, therefore, "the rule of construction requiring construing any ambiguity against the insurer does not apply." Br. of Resp't at 11. But the insurance policy does not define the terms "conversion" or "secretion," nor do the statutes or the WACs requiring the specific policy language regarding these exclusions.[10] And no Washington court has addressed whether an owner's intentional destruction of collateral constitutes "conversion" or "secretion" under the vehicle policy language at issue. Absent definitions of these critical terms, we reject Progressive's argument that we cannot find them ambiguous, and we must first ascertain whether their meaning is plain and clear and whether a strained or forced construction can be avoided. *See Quadrant*, 154 Wn.2d at 172.

II. Ambiguity of the Terms "Conversion" and "Secretion"

¶15 The policy Progressive issued to Grauel expressly states that Reliable's interest "will not be invalidated by any act or neglect of [the policyholder], nor by any change in the title or ownership of [the policyholder's] **covered auto**; PROVIDED, HOWEVER, that the conversion, embezzlement or secretion by [the policyholder] is not covered under said policy unless specifically insured against and premi-

---

[10] Nor does the legislative or rule-making history preceding the statute's implementation in 1968 reveal the legislature's or insurance commissioner's intent in requiring that the exact terms be included in the form loss payable clause found in WAC 284-21-990.

ums paid therefor." CP at 21. There are no definitions provided for the terms "conversion" or "secretion."[11]

A. Dictionary Definitions of Undefined Terms in Insurance Policies

¶16 Undefined terms in insurance contracts should be given their plain, ordinary, and popular meaning, and courts may look to the dictionary to determine common meaning. *Boeing Co. v. Aetna Cas. & Sur. Co.*, 113 Wn.2d 869, 877, 784 P.2d 507 (1990). *Webster's* dictionary defines "conversion" as the "appropriation of and dealing with the property of another as if it were one's own without right." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 499 (2002). *Black's Law Dictionary* defines "conversion" as "[t]he wrongful possession or disposition of another's property as if it were one's own; an act or series of acts of willful interference, without lawful justification, with an item of property in a manner inconsistent with another's right, whereby that other person is deprived of the use and possession of the property." BLACK'S LAW DICTIONARY 381 (9th ed. 2009).

¶17 "Secretion" is also not defined in Progressive's policy. We must define the term in a way understood by the average person. *See Nat'l Union Fire Ins. Co. of Pittsburg v. Zuver*, 110 Wn.2d 207, 210, 750 P.2d 1247 (1988). *Black's* defines "secretion of assets" as "[t]he hiding of property, usu[ally] for the purpose of defrauding an adversary in litigation or a creditor." BLACK'S at 1473. To "secrete" is defined as "[t]o conceal or secretly transfer (property, etc.), esp[ecially] to hinder or prevent officials or creditors from finding it." BLACK'S at 1473. "Secretion" is defined in *Webster's* as "the act of hiding something." WEBSTER'S at 2052.

¶18 Under the common meaning of "conversion," Grauel could not convert his own vehicle. Nor did he hide

[11] Progressive does not claim that Grauel's acts amounted to " 'embezzlement.' " Br. of Appellant at 13 n.1.

the vehicle or secretly transfer it in a manner amounting to the common understanding of the term "secretion"; instead, he had it burned on a neighboring property where authorities quickly responded to the fire.

## B. Cases Interpreting "Conversion" and "Secretion"

¶19 Although application of the dictionary definitions of "conversion" and "secretion" to Grauel's conduct and to Progressive's insurance contract terms could lead to the conclusion that Reliable is entitled to recover under Grauel's policy with Progressive, the parties brief and discuss numerous cases whose differing interpretations and explanations of these terms cause much confusion about whether an insured's intentional destruction of a vehicle excludes coverage for the lienholder's security interest in the vehicle. Reported cases have dealt with the undefined terms "conversion" and "secretion" by concluding that "conversion" and "secretion" refer to criminal acts, not torts,[12] or by concluding that the insured must be in default on payments before the "conversion" or "secretion" exclusions applied.[13] Other courts have applied definitions of "conversion" under state tort law.[14] Given the several reasonable interpretations of these

---

[12] *Nat'l Cas. Co. v. Gen. Motors Acceptance Corp.*, 161 So. 2d 848, 852 (Fla. Dist. Ct. App. 1964) ("We are satisfied that the defendant insurer, in using the word 'conversion' in connection with the words 'embezzlement and secretion' had reference to conversion in the criminal sense rather than as a tort.").

[13] *Wells Fargo Equip. Fin., Inc. v. State Farm Fire & Cas. Co.*, 805 F. Supp. 2d 213, 222 (E.D. Va. 2011) (exclusion was intended to protect lienholders "whenever a borrower could not afford a monthly payment and either kept the car illegally or removed the vehicle from the reach of the lienholder"); *see also* Neil J. Lehto, *The Standard Mortgage Clause under Attack: The Lender's Insurance Claim When a Borrower Commits Arson*, 66 U. Det. L. Rev. 603, 615 (1989) ("[T]his special exclusion for borrower's conversion, embezzlement, and secretion was specifically inserted into the standard mortgage clause so it would apply to a lender's easy theft claim when a borrower for any reason missed a payment.").

[14] *Gibraltar Fin. Corp. v. Lumbermens Mut. Cas. Co.*, 400 Mass. 870, 873, 513 N.E.2d 681 (1987) ("[C]onversion requires interference with property to which another has an immediate right of possession. Nothing in the record indicates that at the time of the arson anyone other than the owner had an immediate right to possess the insured vehicle. Burning of the vehicle by the owner was not a conversion." (citation omitted)); *see Foremost Ins. Co. v. Allstate Ins. Co.*, 439

terms, we hold that use of the word "conversion" or "secretion" without definition in vehicle insurance policies creates insurmountable ambiguity, leading to coverage rather than exclusion of coverage under normal rules of contract interpretation. *See Murray*, 2 Wn. App. at 992.

### 1. Washington

¶20 Washington law does not provide a clear answer to whether Grauel's intentional burning of the vehicle constitutes "conversion." Washington courts have addressed conversion in differing settings and have stated some general rules regarding conversion actions in Washington but have not specifically addressed whether the owner's intentional destruction of the collateral triggers the exclusion for "conversion" under an automobile insurance policy.

¶21 A recent decision from Division Three of this court briefly addressed in dicta an insurance claim based on the use of the term "conversion" in an auto insurance policy. *Greenfield v. W. Heritage Ins. Co.*, 154 Wn. App. 795, 802, 226 P.3d 199 (2010). Greenfield first claimed coverage under an insurance policy covering loss caused by "theft," and the insurer denied coverage. *Greenfield*, 154 Wn. App. at 798-99. The court held that no "theft" occurred because the party who sold the vehicle lacked criminal intent, thus denial of coverage was proper. *Greenfield*, 154 Wn. App. at 802. Turning briefly to Greenfield's claim that the sale of the vehicle followed by bankruptcy of the seller amounted to "conversion" under a separate policy provision, the court noted that a long line of cases in Washington has held that "conversion" does not require wrongful intent.[15] *Greenfield*,

---

Mich. 378, 391, 486 N.W.2d 600 (1992) (holding that owner did not " 'convert' " motor home for purposes of exclusion under policy because "a person can[not] 'convert' his own property" (quoting *Foremost Ins. Co. v. Allstate Ins. Co.*, 185 Mich. App. 119, 122, 460 N.W.2d 242 (1990))).

[15] The *Greenfield* court's statement about "conversion" in the context of an insurance policy, although helpful, is not persuasive because it was dicta and the policy language differs from that here.

154 Wn. App. at 802 (citing *In re Marriage of Langham*, 153 Wn.2d 553, 560, 106 P.3d 212 (2005)).

¶22 The court in *Langham* stated that when dealing with the tort of conversion, good faith is irrelevant. " '[N]either good nor bad faith, neither care nor negligence, neither knowledge nor ignorance, are the gist of the action [in conversion].' " *Langham*, 153 Wn.2d at 560 (second alteration in original) (internal quotation marks omitted) (quoting *Judkins v. Sadler-MacNeil*, 61 Wn.2d 1, 4, 376 P.2d 837 (1962)).

¶23 With regard to the tort of conversion, over time, Washington courts have applied two definitions of the nature of property interests required to maintain an action for conversion. The first application traced the tort's development to its "genesis in the common law action of trover." *Eggert v. Vincent*, 44 Wn. App. 851, 855, 723 P.2d 527 (1986) (citing W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 15 (5th ed. 1984)). Historically, a party claiming a cause of action in trover was required to have either "possession" or an "immediate right to possession" of the property. *Eggert*, 44 Wn. App. at 855. Acknowledging the historical possessory requirement, the *Eggert* court held that "the rule in this state is that in order to maintain an action for conversion, the plaintiff must either have been in possession or have an immediate right to possession at the time the goods were converted." 44 Wn. App. at 855.

¶24 The second and more modern definition of "conversion" departs from the strict possessory requirement. In *Meyers Way Development Ltd. Partnership v. University Savings Bank*, Division One of this court held that "the more modern view, which we adopt, holds that to maintain a conversion action, the plaintiff need only establish 'some property interest in the goods allegedly converted.' " 80 Wn. App. 655, 675, 910 P.2d 1308 (1996) (quoting *Michel v. Melgren*, 70 Wn. App. 373, 376, 853 P.2d 940 (1993)). The *Meyers Way* court noted that Prosser also advocates the modern view and "criticizes the immediate possession rule

as archaic and formalistic." 80 Wn. App. at 675 n.16 (citing KEETON, ch. 3, § 15, at 90).

¶25 Our Supreme Court has also applied the modern rule. *Langham*, 153 Wn.2d at 566. In *Langham*, the trial court awarded stock options held in the husband's name to the wife in a dissolution decree. 153 Wn.2d at 556. The husband exercised some of the wife's options in violation of a court order, and the wife sued for conversion. *Langham*, 153 Wn.2d at 556. In holding that the wife could bring a conversion action against the husband for exercising the options, our Supreme Court held that "[t]he older approach to conversion is misguided when applied to intangible property such as stock options . . . . We hold that some property interest in the allegedly converted goods is all that is needed to support an action in conversion." *Langham*, 153 Wn.2d at 566.

¶26 This court has similarly applied the modern approach. *Davenport v. Wash. Educ. Ass'n*, 147 Wn. App. 704, 197 P.3d 686 (2008). In *Davenport*, the plaintiffs' employers deducted an agency shop fee from the plaintiffs' salaries and paid it to the Washington Education Association, which improperly spent the funds. 147 Wn. App. at 709. The plaintiffs sued for conversion, and although this court ultimately held that the plaintiffs did not have the type of property interest required to maintain a suit for conversion, the court relied on the modern rule that a conversion action "requires that the plaintiff have a possessory or other 'property interest' in the chattel." *Davenport*, 147 Wn. App. at 721-22 (internal quotation marks omitted) (quoting *Langham*, 153 Wn.2d at 565).

¶27 Here, Progressive argues that under *Meyers Way*, the modern view that conversion requires merely that the plaintiff establish " 'some property interest in the goods allegedly converted' " "provides express precedent for treating a lender's security interest in property as being subject to conversion." 80 Wn. App. at 675 (quoting *Michel*, 70 Wn. App. at 376); Br. of Resp't at 22. But Progressive's reading

points only to the ambiguity of the term "conversion." The person held to convert the lienholder's interest in *Meyers Way* never actually held an interest in the sale proceeds it converted.[16] *See* 80 Wn. App. at 675 n.17.

2. Other States' Interpretations of "Conversion" or "Secretion"

¶28 Reliable points to various out-of-state cases with analogous facts holding that "conversion" or "secretion" do not apply upon the insured's destruction of the vehicle. At least one court has relied on dictionary definitions and has held that the terms "conversion" and "secretion" do not encompass the policyholder's destruction of the vehicle. *Nationwide Mut. Ins. Co. v. Dempsey*, 128 N.C. App. 641, 644-45, 495 S.E.2d 914 (1998). In *Dempsey*, the purchaser of a vehicle intentionally destroyed it by fire and the insurer denied coverage to the lienholder under a loss payable clause providing that the lienholder's interest would be invalidated due to "conversion or secretion" of the covered vehicle. 128 N.C. App. at 642. Applying the dictionary definitions of "convert": " '[t]o change from one use, function, or purpose to another; adapt to a new or different purpose' " and "secrete": " '[t]o conceal in a hiding place,' " the North Carolina Court of Appeals held that "destruction does not fall within either definition." 128 N.C. App. at

---

[16] In *Meyers Way*, developers granted University Savings Bank a security interest in proceeds from the sale of sand from mortgaged property, requiring that a portion of the proceeds be applied to repayment of the debt. 80 Wn. App. at 659. The developers subsequently sold hundreds of thousands of dollars worth of sand, and the Bank received nothing. *Meyers Way*, 80 Wn. App. at 674. The bank sued the developers for conversion, and the court held that "[b]y virtue of the security interest, the Bank had 'some property interest' in the proceeds from the sale of sand sufficient to maintain a conversion action." *Meyers Way*, 80 Wn. App. at 675 (quoting *Michel*, 70 Wn. App. at 376). The *Meyers Way* court ultimately concluded that "the Bank nevertheless had the right to immediate possession of the proceeds from the sales of sand. The security stated in the security agreement is the proceeds from sand sales. Thus, the moment the borrowers or Meyers Way received any money in exchange for sand, that money was subject to a security interest." *Meyers Way*, 80 Wn. App. at 675 n. 17. But the security interest alone was sufficient (even if not necessary) to arrive at the same outcome.

644-45 (alterations in original) (quoting AMERICAN HERITAGE DICTIONARY SECOND COLLEGE EDITION (1991)).

¶29 Reliable also relies on cases in which courts that have examined the issue of "conversion" under state tort law principles have concluded that the exclusion does not apply to the insured's intentional destruction because those courts held that one cannot convert one's own property. For example, Reliable cites *Gibraltar Financial Corp. v. Lumbermens Mutual Casualty Co.*, in which the owner of an insured vehicle destroyed the vehicle by arson and the lienholder sought coverage from the insurer under a policy that "exclude[d] coverage where the mortgagor convert[ed], embezzle[d], or secrete[d] the insured property." 400 Mass. 870, 871, 513 N.E.2d 681 (1987). The court held that the lienholder was entitled to coverage because "conversion requires an interference with property to which another has an immediate right of possession. Nothing in the record indicates that at the time of the arson anyone other than the owner had an immediate right to possess the insured vehicle. Burning of the vehicle by the owner was not a conversion." *Gibraltar*, 400 Mass. at 873 (citation omitted); *see also Foremost Ins. Co. v. Allstate Ins. Co.*, 439 Mich. 378, 391, 486 N.W.2d 600 (1992) (holding that owner did not "convert" motor home for purposes of exclusion under policy because " 'a person can[not] "convert" his own property' " (alteration in original) (quoting *Foremost Ins. Co. v. Allstate Ins. Co.*, 185 Mich. App. 119, 122, 460 N.W.2d 242 (1990))).

¶30 On the other hand, Progressive points to *Commerce Union Bank v. Midland National Insurance Co.*, 43 Ill. App. 2d 332, 193 N.E.2d 230 (1963) and argues that the court held that the insured converted a vehicle by destroying it. Progressive relies on the *Commerce Union Bank* court's statement that "[i]t is difficult to conclude that either a complete consumption of an article if it is consumable, or its intentional destruction, would be covered by a policy which excluded liability for 'conversion.' " 43 Ill. App. 2d at 334. But Reliable responds that the *Commerce Union Bank*

court merely resolved an evidentiary issue regarding the admissibility of evidence tending to show arson. We agree with Reliable that the court's statements regarding "conversion" were dicta in its discussion of the evidentiary issue.

¶31 Progressive points to other cases that it asserts support its definition of the insurance policy terms, arguing that, therefore, the terms are not ambiguous. *Progressive Am. Ins. Co. v. Fla. Bank at Daytona Beach*, 452 So. 2d 42 (Fla. Dist. Ct. App. 1984); *Universal CIT Credit Corp. v. Kaplan*, 198 Va. 67, 92 S.E.2d 359 (1956); *Union Fire Ins. Co. of Pittsburgh, Pa. v. Care Flight Air Ambulance Serv., Inc.*, 18 F.3d 323 (5th Cir. 1994). But we find those cases unhelpful because (1) the lienholder agreed that the vehicle owner's actions amounted to "conversion," *Fla. Bank*, 452 So. 2d at 45; (2) the case did not deal with an insurance policy, *Universal CIT*, 198 Va. at 68-70; or (3) the party whose actions were challenged was not the owner of property allegedly converted, *Care Flight*, 18 F.3d at 329 ("conversion" resulting from lessee subleasing aircraft).

¶32 Our brief discussion of the differing outcomes of cases addressing the interpretation of the undefined terms "conversion" and "secretion" in a vehicle insurance policy with a lienholder exclusion for acts of "conversion" or "secretion" by the insured illustrates the terms' inherent ambiguity. Therefore, we hold that the terms "conversion" and "secretion" are ambiguous in Progressive's policy and the trial court erred in entering summary judgment for Progressive and denying summary judgment to Reliable.

III. History of Exclusions for "Conversion" and "Secretion" Supports Coverage

¶33 In addition to the dictionary definitions we have discussed and the cases from Washington and other courts, the history and development of the use of the exclusionary terms here regarding recovery under vehicle insurance policies by lienholders support our conclusion that the terms are ambiguous if undefined. A recent decision from

the United States District Court for the Eastern District of Virginia, *Wells Fargo Equip. Fin., Inc. v. State Farm Fire & Cas. Co.*, is particularly instructive. 805 F. Supp. 2d 213 (E.D. Va. 2011) (*Equipment Finance*). The *Equipment Finance* court's comprehensive analysis of the history and meaning of the policy language provides context for interpreting these policy terms and exceptions to coverage. *See* 805 F. Supp. 2d at 218-20.

¶34 In *Equipment Finance*, Wells Fargo obtained a security interest in three trucks owned by Miriam Trucking and State Farm issued an insurance policy to Miriam Trucking covering the trucks and naming Wells Fargo as loss payee. 805 F. Supp. 2d at 216. Two of the trucks were subsequently destroyed by fire, allegedly as a result of the owner's arson, and Wells Fargo, as loss payee, filed claims with State Farm. *Equip. Fin.*, 805 F. Supp. 2d at 216. State Farm denied coverage under the policy's " 'Loss Payable Endorsement,' " which excluded coverage to the lienholder for loss due to the owner's " 'conversion, secretion, or embezzlement' " of the property. *Equip. Fin.*, 805 F. Supp. 2d at 216-18.

¶35 In *Equipment Finance*, the court characterized the language protecting the lienholder from acts of the borrower as a "standard mortgage clause." 805 F. Supp. 2d at 218. It stated:

> The standard mortgage clause is best understood by reference to its predecessor: the open mortgage clause. An open mortgage clause typically provides that loss, if any, be payable to the mortgagee, "as his interest may appear." *Syndicate Ins. Co. v. Bohn*, 65 F. 165, 173 (8th Cir. 1894). In effect, the clause directs an insurer to pay policy proceeds to the lienholder before paying proceeds to the insured party. The lienholder is an appointee of the mortgagor, and his right to recover under the policy is coterminous with that of the insured. The problem with this arrangement, from the perspective of mortgagees, is that indemnity is precarious—"liable to be destroyed by the ignorance, carelessness, or fraud of the mortgagors." *Syndicate*, 65 F. at 173.

Standard mortgage clauses began to appear over a century ago in order to address this deficiency.

*Equip. Fin.*, 805 F. Supp. 2d at 218-19 (some citations omitted).

¶36 The court explained that language providing that the lienholder's interest will " 'not be invalidated by any act or neglect of the [borrower]' " began to appear in conjunction with open mortgage clauses, forming what is now known as the "standard mortgage clause." *Equip. Fin.*, 805 F. Supp. 2d at 219 (quoting *Hastings v. Westchester Fire Ins. Co.*, 73 N.Y. 141, 143 (1878)).[17]

¶37 The *Equipment Finance* court noted that the effect of the standard mortgage clause was " 'that no act or omission on the part of the owner[,] which occurs after the issuance of the policy[,] shall affect the mortgagee's right to recover.' " 805 F. Supp. 2d at 219 (quoting *New Brunswick Fire Ins. Co. v. Morris Plan Bank*, 136 Va. 402, 408, 118 S.E. 236 (1923)). The court concluded that "[m]odern legal authorities substantially agree that a standard mortgage clause constitutes an independent contract between insurer and lienholder, which cannot be negated by the wrongful or negligent acts of the insured party." *Equip. Fin.*, 805 F. Supp. 2d at 219.

¶38 But the standard mortgage clause allowed the lienholder to assert claims under the policy despite the borrower's acts, leaving insurers vulnerable to claims by lienholders under the policy's theft coverage "whenever a borrower could not afford a monthly payment and either kept the car illegally or removed the vehicle from the reach of the lienholder." *Equip. Fin.*, 805 F. Supp. 2d at 222 (citing Neil J. Lehto, *The Standard Mortgage Clause under Attack: The*

---

[17] Similar references to the "standard mortgage clause" also appear in Washington case law. *See Clark v. W. Ins. Co. of Am.*, 168 Wash. 366, 367, 12 P.2d 408 (1932) ("A standard mortgage clause was attached to the policy, providing that the interest of the mortgagee named therein should not be invalidated by any act or neglect of the mortgagor or owner, nor by any change of title or ownership.").

*Lender's Insurance Claim When a Borrower Commits Arson*, 66 U. DET. L. REV. 603, 614-15 (1989)).

¶39 Lehto's *University of Detroit Law Review* article highlights the distinction between a borrower's default and subsequent removal of the vehicle from the reach of the lienholder, which he characterizes as merely a "credit problem," and the intentional destruction of the vehicle, which he characterizes as an "insurance problem" to which coverage should apply:

> A borrower who absconds with the car and does not pay presents solely a credit problem not raising any issue of actual loss of, or damage to, the automobile for which the lender required insurance. However, a borrower who burns his car is an insurance problem because the automobile is actually lost or damaged.

Lehto at 618. Lehto's article further emphasizes that intentional destruction falls outside the scope of the "conversion, embezzlement, or secretion" exclusion, noting that "[t]he risk that borrowers might burn their own cars to avoid making monthly payments to lenders is assumed by insurers who agree that lenders will be insured for loss or damage despite 'any act or neglect' of borrower as set forth in the standard mortgage clause." Lehto at 614 (quoting WILLIAM H. RODDA, PROPERTY AND LIABILITY INSURANCE 329 (1966)).

¶40 As a result of their exposure to claims arising from credit problems with purchasers, insurers began penning exclusions for "conversion," "embezzlement," or "secretion" in standard mortgage clauses to prevent "recovery by the secured party when the buyer absconds with the automobile." *Equip. Fin.*, 805 F. Supp. 2d at 222. Additionally, the *Equipment Finance* court noted that "the conversion proviso acts only as a limit upon the policy's theft coverage." *Equip. Fin.*, 805 F. Supp. 2d at 222; *see also* Lehto at 614 ("keeping the car without making payments is common law conversion, embezzlement, or secretion"). Based on its review of the history of the exclusion clauses, the *Equipment*

*Finance* court held that "the terms 'conversion,' 'embezzlement,' and 'secretion' connote theft or larceny." 805 F. Supp. 2d at 222 (citing *Nat'l Cas. Co. v. Gen. Motors Acceptance Corp.*, 161 So. 2d 848, 852 (Fla. Dist. Ct. App. 1964) ("We are satisfied that the defendant insurer, in using the word 'conversion' in connection with the words 'embezzlement and secretion[,]' had reference to conversion in the criminal sense rather than as a tort.")).[18]

¶41 Examining the plain meaning of "conversion" within the exclusion, the *Equipment Finance* court ultimately determined, as we do, that the term was ambiguous. 805 F. Supp. 2d at 221-22. The court noted that the policy did not define "conversion," nor did it make reference to arson or intentional destruction. *Equip. Fin.*, 805 F. Supp. 2d at 221. The court also noted that "one can fairly read 'conversion' in [the exclusion] as referring to either conversion of the insured vehicles or as referring to the conversion of the lienholder's interest in those vehicles." *Equip. Fin.*, 805 F. Supp. 2d at 221.

---

[18] Four Washington decisions from the 1920s, predating the legislature's and insurance commissioner's 1968 WAC language at issue here, discuss insurance policy language that protected the vendor in a conditional sales contract against " 'all direct loss or damage which he may sustain caused by the disposal or concealment of said automobile by the said [v]endee with intent to defraud the same [v]endor.' " *O.M. Gaudy, Inc. v. N.C. Home Ins. Co.*, 145 Wash. 375, 376, 260 P. 257 (1927); *Seattle Dodge Serv. Co. v. Royal Ins. Co.*, 135 Wash. 524, 525, 238 P. 568 (1925); *Knutzen Auto. Co. v. N. British & Mercantile Ins. Co.*, 127 Wn. 650, 651, 221 P. 339 (1923); *Skoug v. Hartford Accident & Indem. Co.*, 124 Wash. 293, 294, 214 P. 155 (1923). Under the *Equipment Finance* court's analysis of "conversion," "embezzlement," or "secretion," the terms were intended to exclude coverage to lienholders where the borrower absconded with the vehicle and impaired the lienholder's ability to collect on its security. 805 F. Supp. 2d at 222. Conversely, the policy language from the early Washington cases protected the vendor's interest against the vendee's fraud due to " 'disposal or concealment' " of the security. *Gaudy*, 145 Wash. at 376. The Washington decisions indicate that the vendor was entitled to coverage when the vendee failed to pay and prevented the vendor from repossessing the vehicle. *See Gaudy*, 145 Wash. at 376-77 (purchasing vehicle in false name and disappearing with vehicle falls within policy). But the decisions indicate that the policy did not apply when the vendee did not completely prevent the vendor from repossessing the collateral. *See Seattle Dodge*, 135 Wash. at 525-27 (when vendee defaulted on payments, disappeared, and later reported to the vendor that the vehicle was wrecked and abandoned in Idaho, vendor not entitled to coverage because vendee eventually reported vehicle's whereabouts to vendor).

¶42 With respect to the first interpretation, the court held that "[n]othing in the record indicate[d] that Wells Fargo was entitled to the possession of the trucks at the time of their destruction, and Miriam Trucking could not legally convert its own property." *Equip. Fin.*, 805 F. Supp. 2d at 221. Thus, under the first interpretation, the exclusion would not apply. *Equip. Fin.*, 805 F. Supp. 2d at 221.

¶43 With respect to the second interpretation, however, the court noted that "were this Court to construe 'conversion' in its broadest sense, an intentional act of arson that diminishes a lienholder's interest could come within that definition." *Equip. Fin.*, 805 F. Supp. 2d at 221. But because the two interpretations resulted in different outcomes and because the policy did not define the terms, the court held that the policy was ambiguous and construed it against State Farm. *Equip. Fin.*, 805 F. Supp. 2d at 221-22.

¶44 In so doing, the court held that "[t]his narrower interpretation accommodates what courts and commentators have explained as the purpose behind conversion exclusions in standard mortgage clauses." *Equip. Fin.*, 805 F. Supp. 2d at 222. That is, "the exclusion ensures that the lienholder retains the risk that a borrower might be a credit hazard, while protecting his interests in the event of actual loss of, or damage to the automobile for which the lienholder obtained insurance." *Equip. Fin.*, 805 F. Supp. 2d at 222.

¶45 We also conclude, based on our discussion of the history and purpose of the exclusionary policy language relating to the term "conversion," that this term applies equally to the definition of "secretion." Indeed, the *Equipment Finance* court provided that "the terms 'conversion,' 'embezzlement,' *and 'secretion'* connote theft or larceny." 805 F. Supp. 2d at 222 (emphasis added). Accordingly, we interpret the undefined term "secretion" as the insured's "abscond[ing]" with the automobile, which does not exclude coverage under Progressive's policy here for Reliable based on Grauel's burning the vehicle. *Equip. Fin.*, 805 F. Supp. 2d at 222.

¶46 We agree with *Equipment Finance* that the terms "conversion" and "secretion" in vehicle insurance policies without definition are ambiguous. 805 F. Supp. 2d at 221-22. Thus, also relying on the historical development and use of the standard mortgage clause, we construe the policy against Progressive and in favor of Reliable and hold that Grauel's intentional destruction of the vehicle by arson did not fall within the conduct contemplated by the exclusionary clause in Progressive's insurance agreement.

¶47 We hold that construing Progressive's exclusionary clauses to provide coverage for lienholders such as Reliable is consistent with dictionary definitions of the terms, case decisions showing the inherent ambiguity of these terms, and the historical explanation of the creation and use of these exclusionary clauses. *See Equip. Fin.*, 805 F. Supp. 2d at 222.

IV. ATTORNEY FEES

¶48 Reliable requests attorney fees under *Olympic Steamship*. 117 Wn.2d at 53. "*Olympic Steamship* holds that 'an award of fees is required in any legal action where the insurer compels the insured to assume the burden of legal action, to obtain the full benefit of his insurance contract.' " *Humleker*, 159 Wn. App. at 686 (quoting *Olympic S.S.*, 117 Wn.2d at 53). Because Reliable is the prevailing party, it is entitled to fees under *Olympic Steamship*. *Humleker*, 159 Wn. App. at 686.

¶49 We hold that the policy terms "conversion" and "secretion" are ambiguous and thus, under a strict construction, did not apply to Grauel's conduct here to preclude insurance coverage for Reliable. We reverse the trial court's summary judgment order in favor of Progressive and remand for entry of judgment in favor of Reliable as a lienholder entitled to recovery under Grauel's vehicle insur-

ance policy. We also award Reliable reasonable attorney fees under *Olympic Steamship* for trial and appeal.

Worswick, C.J., and Hunt, J., concur.