# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

ASHA SINGH, personally and as
Personal Representative of the Estate
of NARENDRA P. SINGH,

Appellants,

v.

STATE OF WASHINGTON, a
Governmental entity; UNIVERSITY
OF WASHINGTON, a Washington
State entity; and JOHN DOES 1-5,

Respondents.

No. 80662-9-I

DIVISION ONE

UNPUBLISHED OPINION

MANN, C.J. — Asha Singh, personally, and as a personal representative of the

estate of her late husband, Dr. Narendra Singh, appeals an order granting summary

judgment in favor of the University of Washington dismissing claims for: breach of

contract; tortious interference with contract; breach of Washington's Wage and Hours

Act (WWHA), ch. 49.46 RCW; conversion; and failure to accommodate under

Washington's Law Against Discrimination (WLAD), ch. 49.60 RCW.  Singh also

challenges additional presummary judgment orders including: dismissal of claims

brought under the Public Records Act (PRA), ch. 42.56 RCW; an award of sanctions for

failing to attend depositions; denial of continuance requests; and the exclusion of an

expert witness.

Because there is a genuine issue of material fact regarding the reasonable accommodation claim, we reverse summary judgment and remand for trial on that claim alone. We otherwise affirm.

FACTS

A. Background

From 1998 to 2016, Dr. Narendra Singh worked as research faculty for the University of Washington's Department of Bioengineering (Department). Dr. Singh's primary responsibility as research faculty was to conduct research. For 25 years, Dr. Singh conducted groundbreaking work on DNA[1] damage, including developing a technique known as the "comet assay" to quantify DNA damage at the cellular level. Dr. Singh was not tenured and did not receive a salary directly from the University. Instead he was required to obtain grant funding to cover his base salary and research.

In April 2012, Dr. Singh asked the University to reduce his appointment to 50 percent full-time equivalent (FTE) given his low level of research funding and activity. The University approved the request. The following year the University provided bridge funding because Dr. Singh had not generated sufficient funding to cover his base salary. Still unable to pay himself when the bridge funding ended in 2014, the Department voluntarily paid 50 percent of Dr. Singh's salary, but advised him that his faculty employment might end if he did not obtain research funding.

Dr. Singh secured a grant for research concerning "Mobile Phone Use and DNA damage." The grant provided the minimum funding that the University required from

---

[1] Deoxyribonucleic acid.

approximately January 1, 2015, until September 18, 2015. When it ended, Dr. Singh had no funding.

Dr. Singh was diagnosed with Parkinson's disease in 2003. In 2007, following an accident where Dr. Singh injured his hand with liquid nitrogen, Department Administrator Ruth Woods (Woods) completed a disability request form on Dr. Singh's behalf for an "hourly assistant to help in [the] office and laboratory." Woods submitted the form to the University's Disability Services Office ("DSO"), which handles disability accommodation requests for the University. The DSO requested Dr. Singh produce a healthcare provider statement to support the accommodation, which Dr. Singh never provided. The University nonetheless provided Dr. Singh with a student assistant on three separate occasions until September of 2015, when it ceased to do so.

On January 13, 2016, Dr. Singh collapsed at home and was taken to Swedish Hospital. Dr. Singh's wife, Asha Singh, advised Woods that Dr. Singh was "quite ill" and hospitalized but did not provide further detail. The University voluntarily changed Dr. Singh's FTE status and voluntarily paid him so that he received medical benefits retroactive to October 2015. The following month, Singh advised Woods that Dr. Singh was still comatose and requested family medical leave for him, initially for a series of months, and then through January 13, 2017, a full year after the incident. The University approved the leave.

Dr. Singh's family had him discharged and transported to India in February 2016. Dr. Singh passed away in India on December 2, 2016. It is undisputed that Dr. Singh was unable to work or conduct research after January 13, 2016.

-3-

In early 2016, while Dr. Singh was comatose in India, his adult daughter, Himani,[2] used Dr. Singh's University e-mail account and sent a series of e-mails to a private company called Applied Biological Materials (ABM). In the e-mails, Himani expressed Dr. Singh's interest in licensing to ABM a cell line known as "RTN."[3] Himani did not disclose her identity or that her father was comatose in India.

Himani then submitted to the University's CoMotion Department, which manages University intellectual property, paperwork to allow the University to commercialize the RTN cell line and begin licensing negotiations with ABM. Himani completed the "Record of Innovation and Assignment Form" in which she described, using the first person, how Dr. Singh developed the cell line while working at the University with the University's bridge funding. She applied Dr. Singh's electronic signature to the document, and in doing so, affirmatively represented that Dr. Singh had assigned all rights to the RTN cell line to the University and further warranted that Dr. Singh would assist the University in evaluation and possible commercialization of the line.

Unaware of Dr. Singh's incapacity or the forged paperwork, CoMotion negotiated and finalized a licensing agreement with ABM in October 2016. In November and December 2016, unaware of Dr. Singh's condition and subsequent passing, CoMotion

---

[2] We refer to Dr. Singh's children by their first names in order to avoid confusion. We mean no disrespect.

[3] For example, in one e-mail Himani wrote:

> I apologize for the delay in responding to your email and I thank you for getting in touch. Developing the RTN cell line was the basis for my interest in cancer stem cells and studying chemotherapy resistance. I would be interested in collaborating with you and furthering this endeavor. Please let me know how you would like to proceed.
> . . .
> Narendra P. Singh

repeatedly requested Dr. Singh ship materials to ABM, as well as the technical information required to culture and maintain the cells. No one responded.

In March 2017, CoMotion learned of Dr. Singh's December 2016 passing. Because no one had the technical knowledge to culture the RTN cells, CoMotion terminated the agreement with ABM and refunded an upfront down payment of one thousand dollars before any licensing fees were obtained.

On January 17, 2017, attorney Laruen Parris Watts, purporting to represent the Singh family, informed University counsel that Dr. Singh had passed away. Watts requested that Singh be allowed to obtain Dr. Singh's personal items that he had purchased with his own money. The University requested the Singh family provide documentation showing Dr. Singh's ownership of any particular items. On February 14, 2017, the University provided the family with some boxes of Dr. Singh's personal items. On June 16, 2017, following cataloguing of records and identification of additional items, the University provided the Singh family with more than 40 boxes of additional items that appeared were Dr. Singh's personal property.

B. Procedural History

On September 14, 2018, Singh, both in her personal capacity and as a personal representative of Dr. Singh's estate, commenced this action. The complaint alleged intentional and negligent infliction of emotional distress, breach of contract, tortious interference with business expectancy, failure to pay wages, failure to accommodate a disability, and trespass to chattels/conversion. The case scheduling order set a July 2019 discovery deadline with a September 2019 trial date. Singh filed an amended

complaint in June 2019, adding claims for violations of the PRA and wrongful termination.

On September 3, 2019, the trial court granted the University's motion for summary judgment dismissing all of Singh's claims.

Singh appeals.

## ANALYSIS

### A. Claims Dismissed on Summary Judgment

Singh first contends that the trial court erred in granting summary judgment and dismissing claims for: breach of contract; tortious interference with contract; breach of WWHA; conversion; and failure to accommodate under WLAD. We address each claim in turn.

We review summary judgment decisions de novo. Int'l Marine Underwriters v. ABCD Marine, LLC, 179 Wn.2d 274, 281, 313 P.3d 395 (2013). "Summary judgment is proper only where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." Int'l Marine Underwriters, 179 Wn.2d at 281. The moving party has the initial burden of proving the absence of an issue of material fact. Young v. Key Pharms., Inc., 112 Wn.2d 216, 225, 770 P.2d 182 (1989). If the moving party successfully carries that burden, the burden then shifts to the nonmoving party to set forth specific facts rebutting the moving party's contentions and showing that a genuine issue of material fact exists for trial. Pac. Nw. Shooting Park Ass'n v. City of Sequim, 158 Wn.2d 342, 351, 144 P.3d 276 (2006). The party opposing summary judgment may not rely on speculation or argumentative assertions that

unresolved factual issues remain.  Seven Gables Corp. v. MGM/UA Entm't Co., 106 Wn.2d 1, 13, 721 P.2d 1 (1986).

1.  Breach of Contract

In order to demonstrate a breach of contract, a plaintiff must demonstrate that "a valid agreement existed between the parties, the agreement was breached, and the plaintiff was damaged."  Univ. of Wash. v. Gov't Emps. Ins. Co., 200 Wn. App. 455, 467, 404 P.3d 559 (2017).  Singh avers that the trial court erred in granting summary judgment because there was evidence in the record that the University breached its contract with Dr. Singh by failing to preserve his work and administer licensing agreements for his intellectual property.  We disagree.

Singh first contends that the University breached the contract by destroying Dr. Singh's work.  The University counters that Singh has not identified any work that was destroyed and that, regardless, the University owns Dr. Singh's research data.  The University is correct.

Singh relies largely on the University Grants Information Management Memorandum 37 (GIM 37) for the proposition that the University was obligated to "ensur[e] and protect[] the proper management of research data under the initial authority of the Principle Investigator."  While this may be true, GIM 37 is a guidance document that provides "principles regarding rights in Research Data" and must be read "in conjunction with applicable laws, contract terms, and University policies."  Additionally, GIM 37 is clear that "Research Data" belongs to the University, and that while Dr. Singh may have generally determined who has access to his data, "where

-7-

necessary to assure needed and appropriate access, the University has the option to take custody of any or all research data."

Singh next argues that the University breached a contract when it failed to pay Dr. Singh royalties, and that it was required to take additional steps to seek third-party agreements involving Dr. Singh's research. The University counters that it acted in conformity with the documents governing Dr. Singh's research materials, and that it had no obligation to seek additional assistance in maintaining Dr. Singh's cell lines or further licensing them. The University is correct.

After Dr. Singh's incapacitation, he was unable to answer questions regarding his research. Singh produced no admissible evidence that any faculty member was available or qualified to continue the research in Dr. Singh's absence.[4] In addition, Singh has cited no contractual provision requiring the University to allow another faculty member or member of Dr. Singh's family to care for Singh's research data. Finally, per the University's Patent, Invention, and Copyright Policy (PIC Policy), Dr. Singh's assignment of the cell line, and GIM 37, the University owned Dr. Singh's research material, which it had the right to determine how to handle.

Further, following Dr. Singh's incapacitation and subsequent passing, the University was unable to perform under the obligations of its licensing agreement with ABM. Dr. Singh was the only person with the unique knowledge and experience to ship the cell line with the necessary culturing instructions. Thus, the University could not receive royalty payments from ABM and could not provide Dr. Singh his portion of the

---

[4] The only evidence offered by Singh is a letter by one of plaintiff's attorneys asserting that Dr. Gerald Pollack was qualified and had volunteered to maintain Dr. Singh's lab. We agree with the trial court that this assertion is hearsay and inadmissible to defeat summary judgment.

payments. And the University was not required to seek additional buyers for Dr. Singh's research materials; Singh provides no evidence to the contrary. The University had no implied obligation to use reasonable efforts to find a buyer absent a legal necessity to do so. Oliver v. Flow Intern. Corp, 137 Wn. App. 655, 661, 155 P.2d 140 (2006).

Finally, Singh argues that the University breached an implied duty of good faith and fair dealing. "There is in every contract an implied duty of good faith and fair dealing [that] obligates the parties to cooperate with each other so that each may obtain the full benefit of performance." Badgett v. Sec. State Bank, 116 Wn.2d 563, 569, 807 P.2d 356 (1991). This duty to cooperate, however "exists only in relation to performance of a specific contract term." Badgett, 116 Wn.2d at 570.

The University complied with any type of implied good faith and fair dealing. CoMotion exhausted resources to come to an agreement with ABM, an agreement that was initially created when Himani posed as Dr. Singh. CoMotion attempted to perform on the contract and deliver the RTN cell line. It was only after learning of Dr. Singh's passing that it terminated the licensing agreement and refunded ABM's $1,000 initial payment. If the University could not perform the contract, then Dr. Singh was entitled to no proceeds—including the initial down payment.

There is no genuine issue of material fact regarding a breach of contract between Dr. Singh and the University. Summary judgment and dismissal of the breach of contract claims was appropriate.

2. Wage and Hours Act

Singh next argues that genuine issues of material fact barred summary judgment on his claim that the University failed to pay Dr. Singh his teaching wages, and its failure

to pay violated WWHA.  Singh failed, however, to raise this claim in the complaint—instead raising it for the first time in response to the University's motion for summary judgment.  "Complaints that fail to give the opposing party fair notice of the claim asserted are insufficient."  Pac. Nw. Shooing Park Ass'n, 158 Wn.2d at 352.  Singh's teaching wage claim is not properly before us and we decline to address this issue.  Pac. Nw. Shooing Park Ass'n, 158 Wn.2d at 353.[5]

3.  Tortious Interference

Tortious interference with a business expectancy arises when there is (1) a valid business expectancy; (2) the defendant had knowledge of that expectancy; (3) the defendant intentionally interfered, causing termination of the expectancy; (4) the interference was or an improper purpose or used improper means; and (5) the plaintiff was damaged as a result.  Pac. Nw. Shooting Park Ass'n, 158 Wn. 2d at 351-52.  Singh argues that genuine disputed of material fact barred summary judgment against the claim for tortious interference of business expectancy.  We disagree.

Singh failed to establish the elements of a tortious interference claim.  For the license agreement with ABM, Dr. Singh's incapacitation and subsequent passing prevented the University from fulfilling its obligation under the agreement.  Understanding that Dr. Singh was the only person with the unique knowledge and experience to locate and ship the RTN cell line with appropriate culturing instructions, CoMotion e-mailed Dr. Singh four times requesting he ship the required materials.  No

_____

[5] Singh argues in her Reply that the discovery rule should apply because she was only notified of the teaching wages formula in June 2019.  The discovery rule, however, only tolls the date of accrual until the plaintiff "knows or, through the exercise of due diligence, should have known all the facts necessary to establish a legal claim."  Crisman v. Crisman, 85 Wn. App. 15, 20, 931 P.2d 163 (1997).  Here, Singh's delay in obtaining discovery demonstrates that she did not exercise due diligence, thus the discovery rule does not apply.

one responded.  Once CoMotion learned of Dr. Singh's passing, ABM and the University mutually terminated the agreement.  The University had an unfettered right to "contract management" regarding the RTN cell line.

Further, nothing in the record suggests that the University terminated the contract through an improper purpose, or an improper means.  "Exercising in good faith one's legal interests is not improper interference."  Leingang v. Pierce County Med. Bureau, Inc., 131 Wn.2d 133, 157, 930 P.2d 288 (1997).  No one was available to culture and care for the licensed cell line, therefore the University and ABM mutually terminated their agreement.

Additionally, Singh cannot assert her tortious interference claim on the ABM-University agreement.  "A party cannot tortuously interfere with its own contract." Reninger v. Dep't of Corrections, 134 Wn.2d 437 448, 951 P.2d 782 (1998).

Singh cites Cherberg v. Peoples Nat. Bank of Washington, 88 Wn.2d 595, 603, 564 P.2d 1137 (1977), for the premise that "in those instances in which the conduct of the breaching party indicates a motive to destroy some interest of the adverse party, a tort action may lie and items of damage not available in contract actions will be allowed."  Here, however, Singh has cited no evidence that the University had a motive to destroy interests of Dr. Singh.  Rather, the record reflects that the University attempted to fulfill the contract with ABM and that, upon learning of Dr. Singh's passing, the University and ABM mutually terminated the contract.

There is no evidence on record that the University interfered with Dr. Singh's business expectancy.  Similar to the pleadings at the trial court, Singh's claims revolve around unsupported speculation.  Singh lacks evidence that anyone could have cared

for the cell lines. Further, the cell lines and instructions for their care were never sent to ABM and the University did not dissolve the contract until learning of Dr. Singh's passing and concluding that his expertise alone could provide the cell lines to ABM. These facts combined do not rise to tortious interference by the University.

### 4. Conversion

Singh argues genuine issues of material fact barred summary judgment as to the University's conversion of Dr. Singh's property. Singh contends there remain factual dispute over whether (1) Dr. Singh owned the research data in his laboratory; (2) the University was privileged to destroy hazardous chemicals, and dispose of biological materials; and (3) there were personal items in Dr. Singh's laboratory that belonged to him.

"Conversion is the unjustified, willful interference with a chattel which deprives a person entitled to the property of possession. The burden is on the plaintiff to establish ownership and a right to possession of the converted property." Meyers Way Dev. Ltd. Partnership v. Univ. Savings Bank, 80 Wn. App. 655, 674-75, 910 P.2d 1308 (1996). At a minimum, a plaintiff must establish that they have "some property interest in the goods allegedly converted." Meyers Way Dev. Ltd. Partnership, 80 Wn. App. at 675 (internal quotations and citations omitted). Additionally, "[o]ne is privileged to commit and act which would otherwise be a . . . conversion if [they are] acting in discharge of a duty or authority created by law to preserve the public safety, health, peace, or other public interest, and [their] act is reasonably necessary to the performance of [their] duty or the exercise of [their] authority." RESTATEMENT (SECOND) OF TORTS § 265 (AM. LAW INST. 1965).

-12-

## Cell Lines

With respect to Dr. Singh's cell lines and research data that he developed at the University, the University correctly points out that Dr. Singh failed to demonstrate ownership. Dr. Singh agreed to assign all inventions and discoveries that he made while a University employee to the University and further agreed that the University "shall own and hold and such patents, trademarks, or copyrights emanating from those discoveries and inventions." The PIC Policy binding Dr. Singh provided that "[a]s a condition of employment . . . University employees agree to assign all inventions in which the University has an interest to the University." GIM 37 states "[a]ll research data[6] is owned by the University, except as otherwise provided by an agreement with a third party, a law, or University policy, such as copyright policy."

Collectively, these documents bound Dr. Singh. He developed the RTN cell line in 2014 through University provided bridge funding, and subsequently assigned all rights to the cell line to the University through the Record of Innovation and Assignment. Singh failed to demonstrate that there remained a material fact over ownership of the cell lines.

## Chemicals and biologic materials

Singh contends that the University had a duty to maintain biological materials in Dr. Singh's laboratory. As the University correctly explains, however, once Dr. Singh became incapacitated and later died, the University was required to dispose of biological waste remaining in the laboratory. University policy requires its personnel to regulate and properly handle all hazardous and biological/infectious waste materials

---

[6] GIM 37's definition of "research data" includes "cell lines."

under state hazardous waste laws and regulations. Under University policy, "biohazardous waste" includes "cell lines" and "specimen cultures and cultures." Generally, individual researchers "and/or departmental managers/supervisors are responsible for identifying biohazardous waste generated by their activity." After Dr. Singh's death, the responsibility fell to the Department.

The record demonstrates that, following Dr. Singh's passing, the Department disposed of the biological materials in his lab consistent with the University's Environmental Safety & Health Guidelines, thus fulfilling its obligation to dispose of hazardous waste. This was not an unjustified or willful action interfering with Dr. Singh's property.

### Other Personal Materials

Singh argues finally, that there was an "insufficient record of what items in Dr. Singh's lab belonged to him" and therefore an issue remained for trial over whether the Department converted Dr. Singh's personal items.

In response to the Department's motion for summary judgment, Singh submitted a declaration stating that she recalled Dr. Singh "driving a U-haul truck containing the contents of his USC laboratory to the Health Sciences Building at the University of Washington . . . [and] numerous charges for scientific equipment and supplies on our personal debit cards and checks written from our joint account." Singh also offered a statement from one of Dr. Singh's colleagues, Dr. Gerhardt, stated "Dr. Singh's devotion to his work included the purchase of equipment by his own expense."

The Department offered the declaration of its records manager, Elizabeth Mounce. Mounce explained that in January 2017, after learning Dr. Singh had died and

that his family requested the contents of his office and lab, she cataloged the office to identify materials that could be provided and in February 2017 released all items from his office that were "readily identifiable as his personal belongings." Mounce further explained:

> I understand that in March 2017, Plaintiff Asha Singh, through an attorney, claimed that Dr. Singh had used personal funds to purchase equipment for use in his laboratory, and that documentation of those purchases was stored in Dr. Singh's office at the University. As part of the ongoing cataloging process, I made note of all receipts for purchases, to ensure those materials would be provided to Plaintiff. I completed the cataloging process in early June 2017.

> On June 16, 2017, the University released to Asha Singh over 40 banker's boxes of materials from Dr. Singh's office, including any and all personal receipts, invoices, and bank statements that were kept there, as well as copies of all receipts for purchases made with University funds. Asha Singh, Himani Singh, and Arun Singh retrieved the boxes on June 16, 2017, and I supervised the retrieval.

Other than the speculation that there may be additional materials, Singh fails to offer evidence, such as receipts or credit card statements, to create a material issue of fact. Dismissal of Singh's claims for conversion was appropriate.

F. Failure to Reasonably Accommodate under the WLAD

Singh argues that the trial court erred by dismissing Dr. Singh's claim for failure to accommodate under the WLAD.[7] We agree.

Claims under the WLAD are typically inappropriate for resolution at summary judgment "because the WLAD 'mandates liberal construction' and the evidence 'will generally contain reasonable but competing inferences of both discrimination and nondiscrimination that must be resolved by a jury.'" Johnson v. Chevron U.S.A., Inc.,

---

[7] Singh's accommodation claim is limited to the University's discontinuance of a student "support for assistance" in September 2015, as any earlier claims would be barred by the statute of limitations. RCW 4.16.080(2); Antonius v. King County, 153 Wn.2d 256, 261-62, 103 P.3d 256 (2004).

-15-

159 Wn. App. 18, 27, 244 P.2d 438 (2010) (footnote omitted) (quoting Martini v. Boeing Co., 137 Wn.2d 357, 364, 971 P.2d 45 (1999)); Davis v. W. One Auto Grp., 140 Wn. App. 449, 456, 166 P.2d 807 (2007).  We only "grant summary judgment when the plaintiff fails to raise a genuine issue of fact on one or more prima facie elements." Johnson, 159 Wn. App.at 27.

The WLAD prohibits an employer from discriminating against any person because of "the presence of any sensory, mental, or physical disability" RCW 49.60.180(3), and supplies a cause of action "when the employer fails to take steps reasonably necessary to accommodate an employee's" disability.  Johnson, 159 Wn. App. at 27; RCW 49.60.030(1)(a).  Remedies for a violation of the WLAD include injunctive relief, actual damages, and costs, including reasonable attorney fees.  RCW 49.60.030(2).

The WLAD defines disability as "the presence of a sensory, mental, or physical impairment that: (i) is medically cognizable . . .; or (ii) [e]xists as a record or history; or (iii) [i]s perceived to exist."  RCW 49.60.040.  There is no dispute that Dr. Singh's Parkinson's disease was a qualifying limitation under the WLAD.

"[T]o establish a prima facie case of failure to reasonably accommodate a disability" under the WLAD, "a plaintiff must show that (1) the employee had a sensory, mental, or physical abnormality that substantially limited his or her ability to perform the job; (2) the employee was qualified to perform the essential functions of the job in question; (3) the employee gave the employer notice of the abnormality and its accompanying substantial limitations; and (4) upon notice, the employer failed to affirmatively adopt measures that were available to the employer and medically

necessary to accommodate the abnormality" Davis v. Microsoft Corp., 149 Wn.2d 521, 532, 70 P.2d 126 (2003); RCW 49.60.040(7).

When an employer has notice of a disability, "this notice then triggers the employer's burden to take 'positive steps' to accommodate the employee's limitations." Goodman v. Boeing Co. 127 Wn.2d 401, 408, 899 P.2d 1265 (1995). Employers must take these steps unless it "would impose an undue hardship on the conduct of the employer's business." Doe v. Boeing Co. 121 Wn.2d 8, 18, 846 P.2d 531 (1993). The onus is on the employee to "giv[e] the employer notice of the disability." Goodman, 127 Wn.2d at 408. Once notice is given, the employee also "retains a duty to cooperate with the employer's efforts . . . [The WLAD] thus envisions an exchange between employer and employee where each seeks and shares information to achieve the best" possible outcome. Goodman, 127 Wn.2d at 408-09.

It is undisputed that the University knew of Dr. Singh's Parkinson's disease. There is a genuine dispute however, whether providing Dr. Singh with research assistants was an affirmatively adopted measure necessary to accommodate Dr. Singh's disability.

After Dr. Singh burned his fingertips with liquid nitrogen, Woods submitted a disability accommodation request form on Dr. Singh's behalf for an "hourly assistant to help in [the] office and laboratory." In her declaration, however, Woods claims that student assistants later supplied to Dr. Singh were provided as a means of support for faculty who were struggling to obtain funding. Two of Dr. Singh's former student assistants submitted declarations describing tasks they performed as assisting Dr. Singh with limitations involving his Parkinson's including helping him up from his chair,

helping him place the key in his office door, giving presentations due to his vocal difficulties, and helping him with anything that his tremors prevented him from doing easily.

In 2015, the University provided Dr. Singh with research assistant K.V. Dr. Singh wrote that K.V. assumed "increased tasks and responsibilities that include helping [him] write grants and manuscript preparation," thus implying that K.V. assisted Dr. Singh due to his physical limitations. The University counters that K.V. worked for the traditional research assistance that faculty seek and not as an accommodation for Dr. Singh. Whether K.V. was provided as an accommodation is a material dispute.

The University responds that Dr. Singh failed to notify it of an ongoing need for accommodation. The University cites Gamble v. City of Seattle, 6 Wn. App. 2d 883, 893-95, 431 P.3d 1091 (2018), for the proposition that Dr. Singh had a continuing burden to inform the University that he required an assistant as an accommodation. In Gamble, the employer accommodated its employee in a number of ways, including a "four ten" schedule. The employer subsequently changed its policy to disallow "four ten" schedules. Gamble, 6 Wn. App. 2d at 893-95. When the employee returned from medical leave, she recognized the policy change and requested alternating Wednesday's off, which was granted. Gamble, 6 Wn. App. 2d at 893-95. On summary judgment, the trial court rejected the employee's argument that removing the "four ten schedule constituted a failure to accommodate; it was the employee's affirmative burden to inform the employer that she required the accommodation." Gamble, 6 Wn. App. 2d at 887, 895.

Here, unlike <u>Gamble</u>, Dr. Singh had an ongoing, debilitative, and worsening disease. The University provided Dr. Singh with an assistant from 2007 to 2015. If in fact these assistants were provided to assist Dr. Singh with his limitations due to Parkinson's, it makes no sense that Dr. Singh would need to notify the University for the University to know that he would always need someone to carry out tasks that his disability permanently prevented him from doing. Such is the nature of his disease. This raises two questions of material fact. First, if the research assistants were an accommodation for Dr. Singh's Parkinson's, was the termination of such assistance a violation of the WLAD? And second, if the research assistants were not an accommodation for Dr. Singh's Parkinson's, was there a complete failure to accommodate? Dismissal of Dr. Singh's accommodation claim under the WLAD was not appropriate.

## B. <u>Other Trial Court Orders</u>

Singh also challenges several presummary judgment orders including: dismissal of claims brought under the PRA; an award of sanctions for failing to attend depositions; denial of continuance requests; and the exclusion of an expert witness. We address each in turn.

### 1. <u>Public Records Act</u>

Singh argues that the trial court erred in dismissing her claim for PRA violations under CR 12(b)(6). We disagree. Dismissal of a claim under CR 12(b)(6) is a question of law this court reviews de novo. <u>Daniels v. State Farm Mut. Auto. Ins. Co.</u>, 193 Wn.2d 563, 571, 444 P.3d 582 (2019).

On January 27, 2017, Singh requested documents from the University under the PRA. The University produced two batches of records on May 3 and June 17, 2017. The latter installment included a letter stating "this concludes the University's response to your public records request." Two years later, on June 4, 2019, Singh filed their first amended complaint adding a PRA claim and alleging that the University failed to make an "adequate search" for responsive records.

Claims for an alleged violation of the PRA "must be filed within one year of the agency's claim of exemption or the last production of a record on a partial or installment basis." RCW 42.56.550(6). This "statute of limitations begin[s] on an agency's final, definitive response to a public records request." Belenski v. Jefferson County, 186 Wn.2d 452, 460, 378 P.3d 176 (2016). There is no dispute that Singh's PRA claim was filed more than one year after the University closed its response to Singh's record request.

Singh argues that the trial court erred in failing to apply equitable tolling to allow the claim to proceed. Equitable tolling may apply to an otherwise time-barred PRA claim. Belenski, 186 Wn.2d at 458-59, 461-62. A party asserting equitable tolling bears the burden of pleading and ultimately proving "bad faith, deception, or false assurances by the defendant and the exercise of diligence by the plaintiff." Price v. Gonzalez, 4 Wn. App. 2d 67, 75-76, 419 P.3d 858 (2018). Here, Singh did not allege that the University engaged in bad faith, deception or false assurances. Rather, she alleges only that the documents produced in discovery "should have been identified and produced in response the original records request." Because Singh did not meet her

burden, equitable tolling does not apply and dismissal of the PRA claim was appropriate.

2. Sanctions for Failing to Attend Depositions

Singh argues that the trial court erred in sanctioning the Singhs after they did not attend their depositions. We disagree. We review an award of sanctions for an abuse of discretion. Wash. State Physicians Ins. Exch. & Ass'n v. Fisons Corp., 122 Wn.2d 299, 338, 858 P.2d 1054 (1993).

Under CR 37(d)(1), a trial court may impose sanctions against any party who fails to "appear before the officer who is to take his or her deposition, after being served with proper notice." Under CR 37(d)(3), "the court shall require the party failing to act or the attorney advising the party or both to pay the reasonable expenses, including attorney fees, caused by the failure, unless the court finds that the failure was substantially justified or that other circumstances make an award of expenses unjust."

In March 2019, counsel for the parties agreed on deposition dates in early May for Asha, Himani and, Arun. The University confirmed the deposition dates by issuing subpoenas. Three court days before the scheduled depositions, Singh's counsel proposed postponing the Singhs' depositions. After the University declined, Singh moved to shorten time and postpone the depositions, arguing that documents recently produced in discovery might prompt a motion for leave to amend. Singh's counsel then disclosed that they would be seeking leave to amend the complaint to dismiss the claim of negligent infliction of emotional distress and add a claim of retaliation and requesting a trial continuance. Singh's counsel also stated the Singhs family would not be attending the depositions. The Singhs did not appear for their depositions.

The University moved to dismiss pursuant to CR 43(f)(3), and alternatively, for attorney fees the University incurred due to the Singhs' failures to attend. The trial court denied the motion to dismiss, but ordered that Singh reimburse the University $13,295.96 for fees associated with the missed depositions, including the motion to dismiss, as well as the oppositions to Singh's motions to postpone and shorten time.

Here, the Singhs were obligated to attend their depositions. When they failed to do so, the trial exercised its authority under CR 37 to award attorney fees and costs, the trial court did not abuse its discretion.

3. <u>Denial of Continuances</u>

Singh argues that the trial court erred in denying her requests for continuances at trial. We disagree.

We review a decision to grant or deny a continuance for an abuse of discretion. <u>Balandzich v. Demeroto</u>, 10 Wn. App. 718, 720, 519 P.2d 994 (1974). A trial court may exercise its discretion to "manage its own affairs so as to achieve the orderly and expeditious disposition of cases." <u>Woodhead v. Disc. Waterbeds, Inc.</u>, 78 Wn. App. 125, 129, 896 P.2d 66 (1995). A trial court may properly deny a motion for a continuance when "(1) the requesting party does not offer a good reason for the delay in obtaining the desired evidence; (2) the requesting party does not state what evidence would be established through the additional discovery; or (3) the desired evidence will not raise a genuine issue of material fact." <u>Cameron v. Atlantic Richfield Co.</u>, 8 Wn. App. 2d 795, 812-13, 442 P.3d 31 (2019).

The original scheduling order set trial for September 16, 2019. After five months of discovery, Singh requested a six-month trial continuance and a stay of proceedings in

-22-

order to find new counsel.  On May 8, 2019, the trial court granted a two-week stay but denied the continuance because "[i]t is unclear at this point whether Plaintiff will retain new counsel and, if so, whether that new counsel will actually need a continuance."

On May 10, 2019, Attorney Gail Luhn appeared as Singh's new counsel. Because of an upcoming surgery and the complexity of the case, Luhn filed a motion for a six-month trial continuance and for leave to file an amended complaint.  The motion for leave to amend sought to add claims of interference with protected leave under the WLAD, alleged PRA violations, and for wrongful termination on account of disability. The motion also sought to withdraw Singh's personal claim for negligent infliction of emotional distress.

The trial court denied the six-month extension, but instead granted a five-week extension, which rescheduled the trial to October 21, 2019.  The trial court also granted Singh's motion for leave to amend the complaint.  Six weeks later, on July 15, 2019, Luhn withdrew and attorney David Adler filed a notice of appearance.  Singh then filed a third motion for a four-month trial continuance.  Adler had previously represented the Singhs on the same claims.  Trial was still 12 weeks away.  The trial court denied the trial continuance.

Based on the record before us, the trial court did not abuse its discretion in denying the requested trial continuances.

4.  Exclusion of Expert Witness

Singh argues that the trial court erred in excluding her expert, Dr. Rick Schwartz, as a potential expert witness for trial and awarding the University its attorney fees for moving to exclude Schwartz.  We disagree.  We review decisions of the trial court to

admit or exclude evidence, as well as its award of sanctions, for an abuse of discretion. State v. Olmedo, 112 Wn. App. 525, 530, 49 P.3d 960 (2002); Wash. State Physicians Ins. Exch. &, 122 Wn.2d at 338.

On July 1, 2019, Singh untimely disclosed Dr. Rick Schwartz as a potential expert witness. The University filed a motion to exclude Dr. Schwartz because the disclosure was untimely and did not include a summary of his opinions or their basis, violating King County Local Civil Rule (KCLCR) 26(k)(3)(C).

After considering less severe sanctions under Burnet v. Spokane Ambulance, 131 Wn.2d 484, 933 P.2d 1036 (1979), on July 29, 2019, the trial court denied the motion to exclude Schwartz's testimony. The trial court instead required Singh to provide by noon on August 5, 2019, "a complete disclosure" regarding Schwartz, which includes all information required by KCLCR 26(k). The trial court stated that "failure to comply with this disclosure may result in further sanctions, including but not limited to the exclusion of Schwartz."

On August 5, 2019, Singh filed a motion for reconsideration on the trial court's order regarding Schwartz that included an unsigned declaration that lacked a summary of Schwartz's opinions or basis thereof. The University renewed its motion to exclude Schwartz, and requested the trial court order Singh to reimburse the University's attorney fees and costs associated with Singh's failure to timely and properly identify Schwartz. The trial court granted the motion and ordered Singh to pay the attorney fees and costs.

Singh asserts that, after the trial court's order granting summary judgment, the University's renewed motion for exclusion and sanctions became moot. Versuslaw, Inc.

-24-

v. Stoel Rives, LLP, 127 Wn. App. 309, 331, 111 P.3d 886 (2005). We disagree. While the motion for exclusion may be moot, the University's motion for sanctions is not. The University still had a legally cognizable interest in compensation for unnecessary efforts due to Singh's failure to follow the trial court's instructions.

The trial court denied the University's initial motion for exclusion, giving Singh a second chance to have Schwartz as an expert witness. The court instructed Singh to include a summary of Schwartz's opinions and a basis for them. She failed to follow this instruction. The trial court did not abuse its discretion.

We reverse summary judgment dismissal of Singh's claim for accommodation and remand for further proceedings. We otherwise affirm.

_____
Mann, C.J.

WE CONCUR:

_____          _____
                                  Appelwick, J.